IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ABLAISE, LTD., | ) | Civil Action No.: 1:07-CV-01836 |
| Plaintiff, | ) | |
| | ) | Judge James Robertson |
| v. | ) | |
| | ) | [Filed Electronically] |
| NAVTEQ CORP., FEDEX CORP., FEDEX | ) | |
| CORPORATE SERVICES, INC., GENERAL | ) | |
| MOTORS CORP., ALASKA AIR GROUP, | ) | **ORAL HEARING REQUESTED** |
| INC., AND CIRCUIT CITY STORES, INC. | ) | |
| | ) | |
| Defendants. | ) | |

### FEDEX CORPORATE SERVICES' MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO SEVER AND TRANSFER PURSUANT TO 28 U.S.C. §§ 1404 OR 1406

Ablaise initially filed this suit against the wrong corporate entity. FedEx Corporation does not make, operate, or maintain the accused *fedex.com* website. After this mistake was brought to its attention, Ablaise filed an Amended Complaint on November 5, 2007, adding FedEx Corporate Services, the subsidiary actually responsible for the accused website. FedEx Corporate Services, a Tennessee company, however, does not—by itself—have the requisite contacts with this district for a suit against it to be proper and any contacts that parent FedEx Corporation may have may not be imputed to its subsidiary. Accordingly, this Court should exercise its discretion to sever the FedEx companies from this lawsuit and transfer that portion relating to the FedEx companies to the Western District of Tennessee, where proper jurisdiction exists over *both* FedEx companies. Moreover, while all of the FedEx companies' witnesses and documents are located in Tennessee, Ablaise lacks a good argument as to why it cannot bring its two witnesses and minimal documents to that forum. Accordingly, the relevant factors favor transfer to the Western District of Tennessee.

FedEx Corporation filed its Motion to Dismiss and/or Transfer on October 24, 2007, and briefing on that motion has concluded. FedEx Corporate Services respectfully requests that, if oral hearing is held, that both motions to dismiss be scheduled for hearing on the same date and time.

## I.     FACTS

FedEx Corporate Services (also known as "FedEx Services") makes, owns, and operates the www.fedex.com website. (Declaration of Christine P. Richards ("Richards Decl.") [Docket No. 6-5], at ¶ 1.) Public online records of the registrar, Network Solutions, at http://www.networksolutions.com/whois/index.jsp, show that the accused *fedex.com* website is registered to FedEx Services, 70 FedEx Parkway, Collierville, TN 38017. (Declaration of Jeffrey Danley ("Danley Decl."), ¶ 1.)

FedEx Services has approximately 15,000 employees, of which approximately 5081 employees work in the field of Information Technology ("IT"). (Declaration of Karen Miller ("Miller Decl."), ¶ 1.) FedEx Services houses its employees in several buildings in and around Memphis, and the adjoining city of Collierville. Miller Decl., ¶ 1. For example, some employees have offices at 3610 Hacks Cross Road, Memphis, while others have offices at 70 FedEx Parkway, Collierville, less than five miles away. *Id.*

The largest majority of the FedEx Services' IT employees (close to 3000) are resident in Tennessee. Miller Decl., ¶ 3. Key FedEx Services employees having knowledge regarding the development, operation, and/or maintenance of the *fedex.com* website are resident in Tennessee. *Id.*, ¶ 4. Key FedEx Services management personnel who have responsibility for the *fedex.com* website, such as the Senior Vice President of IT, the Vice President of IT, and the Director of IT, are all resident in Tennessee. *Id.*, ¶ 5. All key documents relevant to the development, operation, and maintenance of the *fedex.com* website may be found in or are accessible from

Tennessee. *Id.*, ¶ 6. The servers from which the pages of the *fedex.com* website are served are located in Tennessee. *Id.*, ¶ 7. None of the FedEx Services employees responsible for the *fedex.com* website are resident in DC. *Id.*, ¶ 8.

FedEx Corporation has approximately 260-270 employees, the vast majority of whom are resident in Tennessee. Danley Decl., ¶ 2. Only twelve employees (four of whom are administrative assistants) work in the Government Affairs office in the District of Columbia, and these employees all conduct business related to federal or government affairs. Danley Decl., ¶ 3. Moreover, none of the FedEx Corporation employees in the DC office perform services related to the accused *fedex.com* website. Miller Decl., ¶ 9.

The FedEx family of companies includes not only the corporate parent, FedEx Corporation, but also a number of wholly-owned subsidiaries that "compete collectively, operate independently, and manage collaboratively, under the respected FedEx brand." (Declaration of Jeffrey J. Downey [Docket No. 8-2], Exh. A, p. 3). The *fedex.com* website is referred to as "our Web site" by FedEx Corporation because, in the Form 10-K, FedEx Corporation is charged with responding on behalf of the FedEx family of companies and, through the website, content describing the respective products and services of the various companies operating under the FedEx brand may be viewed. *Id.* However, each of the FedEx companies operates independently, each focusing on its own respective market. *Id.*, p. 5. Each company's operations, cost structure, and culture are designed to serve the unique customer needs of a particular market segment. *Id.*

## II.    ARGUMENT

### A.    FedEx Services Lacks Sufficient Contacts with This District for This Suit to be Proper Here

Only after FedEx Corporation filed its motion to dismiss FedEx Corporation from this lawsuit did Ablaise file an Amended Complaint adding FedEx Services as a party. But jurisdiction over FedEx Services is not proper here because FedEx Services on its own does not have sufficient contacts with this District.

FedEx Services had approximately 15,000 employees, of which approximately 5081 employees work in the field of IT. Miller Decl., ¶ 1. The largest majority of the FedEx Services IT employees (close to 3000) are resident in Tennessee. Miller Decl., ¶ 3. Key FedEx Services management personnel who have responsibility for the *fedex.com* website, such as the Senior Vice President of IT, the Vice President of IT, and the Director of IT, are all resident in Tennessee. Miller Decl., ¶ 5. The servers from which the pages of the *fedex.com* website are served are located in Tennessee. Miller Decl., ¶ 7. All key documents relevant to the development, operation, and maintenance of the *fedex.com* website may be found in or are accessible from, you guessed it, Tennessee. Miller Decl., ¶ 6.

In its Amended Complaint, Ablaise makes only bare and conclusory assertions, but provides no facts, to support its claim that jurisdiction over FedEx Services is proper in this district. While FedEx Services, like FedEx Corporation and many other foreign companies, is registered to do business in DC and has a registered agent for service of process, that is not in and of itself a sufficient basis for jurisdiction. *See Bayles v. K-Mart Corp.*, 636 F. Supp. 852, 856 (D.D.C. 1986) (finding lack of jurisdiction when defendant's "only alleged contacts with the District are advertising and maintenance of a registered agent for receipt of process."). Courts in this district have wisely recognized that due process requires that courts also determine whether a

party is doing business in the District within the meaning of § 13-334(a). *AMAF Int'l Corp. v. Ralston Purina Co.*, 428 A.2d 849, 851 (D.C. 1981) ("[W]here, as here, a foreign corporation is authorized to do business in the District and has an address (with a phone listing) at which its agent may be served, the broader 'doing business' statute comes into play." In *AMAF International Corp. v. Ralston Purina Co.*, for example, the court found jurisdiction not only because the company maintained a registered agent and had done business in the District for twenty-five years, but also because it had conceded that it sold its products in stores in the District and the contract in dispute was initiated at least in part based on advertising in the District. 428 A.2d at 851. *AMAF* is inapposite because, unlike Ralston in *AMAF*, FedEx Services does not have any customers, and therefore does not make, use, or sell any potentially infringing products or services, including the accused website, in the District of Columbia. Danley Decl., Exh. D, ¶ 4.

　　As is the case with FedEx Corporation, information about FedEx Services is only passively displayed on the *fedex.com* website to interested readers. Miller Decl., ¶ 10. The *fedex.com* website does not permit transactions between residents of the District of Columbia and FedEx Corporation 24 hours a day. In fact, there exists no interactivity between residents of the District and FedEx Corporation itself through the *fedex.com* website. *Id.*

　　While potential investors are provided with information such as charts and quotes relating to the FDX stock, and information on how to purchase stock. Nothing on the website, however, allows a user to actually purchase stock directly from FedEx Corporation or any other FedEx company. In fact, as shown in Downey Declaration, Exhibit L [Docket No. 8-14], the website states very clearly that in order to purchase stock the reader must contact third party Compushare (located in Rhode Island) by the methods provided. *Id.* The site very clearly cautions:

"**Important:** The Web site to which you are being provided a link above is **not part of the FedEx Web site**. This link is provided for your convenience only." *Id.* (emphasis added).

Ablaise may claim that the sheer availability of the *fedex.com* website to DC residents should subject FedEx Services to general jurisdiction, citing *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506 (D.C. Cir. 2002). However, the D.C. Circuit has declined to find personal jurisdiction over non-residents that use websites in a passive informational capacity, even if the websites are viewed by residents of DC. *GTE New Media Servs. v. BellSouth Corp.*, 199 F.3d 1343, 1349 (D.C. Cir. 2000) (holding "personal jurisdiction surely cannot be based solely on the ability of District residents to access the defendants' websites, for this does not by itself show any persistent course of conduct by the defendants in the District.") The GTE Court found the very idea of finding personal jurisdiction in the District based on a passive, informational website "far-fetched":

> GTE appears to suggest that, when a District resident accesses the defendants' Yellow Pages websites, the defendants are somehow "transacting business" in the District. This is a far-fetched claim on this record. Access to an Internet Yellow Page site is akin to searching a telephone book—the consumer pays nothing to use the search tool, and any resulting business transaction is between the consumer and a business found in the Yellow Pages, not between the consumer and the provider of the Yellow Pages. In short, there is nothing here to indicate that District residents actually engage in any business transactions with the defendants.
>
> When stripped to its core, GTE's theory of jurisdiction rests on the claim that, because the defendants have acted to maximize usage of their websites in the District, mere accessibility of the defendants' websites establishes the necessary "minimum contacts" with this forum. *See* Br. for Appellee at 16. This theory simply cannot hold water. Indeed, under this view, personal jurisdiction in Internet-related cases would almost always be found in any forum in the country.

*GTE*, 199 F.3d at 1350.

The Federal Circuit is in accord. In *Trintec Industries, Inc. v. Pedre Promotional Products, Inc.*, 395 F.3d 1275, 1281 (Fed. Cir. 2005), the court downplayed the significance of

the fact that Pedre's website advertised its products to residents of the District because the website was not targeted directly to residents of the District alone, but rather was accessible to all customers throughout the country with Internet access. *Id.* (citing *GTE*, 199 F.3d at 1349, and *Gorman*, 293 F.3d at 512 & n.5). In *Trintec*, the Federal Circuit ultimately remanded the matter back to the DC Court at least in part because the number of actual sales in the District, whether in person or over the Internet, was unknown. In the case at hand, that number is known. FedEx Corporation does not have any customers, and therefore does not make, use, or sell any potentially infringing products or services, including the accused website, in the District of Columbia. Danley Decl., Exh. D, ¶ 4.

**B.    FedEx Services Is Separate and Distinct from FedEx Corporation Such That Each Company's Actions May Not be Imputed to the Other**

The separate corporate identities of FedEx Corporation and FedEx Services is evident from the very documents Ablaise uses as exhibits to its Opposition to the Motion to Dismiss FedEx Corporation, filed on November 5, 2007 [Docket. No. 8]. As Exhibit A to the Declaration of Jeffrey J. Downey [Docket No. 8-2], for example, Ablaise provided the Annual Report for FedEx Corporation (i.e. Form 10-K). The Form 10-K states:

> FedEx Corporation ("FedEx") provides a broad portfolio of transportation, e-commerce and business services through companies that compete collectively, **operate independently** and manage collaboratively, under the respected FedEx brand. (Exhibit A, p. 1.)

The "Fact Sheet" for FedEx Corporation that Ablaise offers as Exhibit E lists its headquarters as Memphis, TN, and refers the reader to other "company-specific" fact sheets for information about other subsidiaries, such as FedEx Services. [Docket. No. 8-6]

The fact that the consolidated annual report for the FedEx family of companies references a general *fedex.com* website used by many FedEx companies proves, at most, that FedEx Corporation shares a website with other FedEx entities. However, a reference to a consolidated

website and the provision of legal guidance for subsidiaries are both part of the normal relationship between parent and subsidiary. *Cf., e.g., United States v. Bestfoods*, 524 U.S. 51, 71-72 (1998) ("[M]onitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability."); *Kasprzak v. Am. Gen. Life & Accident Ins. Co.*, 914 F. Supp. 144, 147 (E.D. Tex. 1996) ("Merely showing a blending of activities between the parent and subsidiary, such that they may have had some or all of the same directors or officers, filed consolidated income tax returns, shared the same corporate logo, conducted inter-corporate business, or officed in the same building, is not alone sufficient to make the parent liable."); *Walker v. Newgent*, 583 F.2d 163, 167 (5th Cir. 1978) ("A subsidiary corporation will not be regarded as the alter ego of its parent because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of control that stock ownership gives to stockholders.").

C.    **The Allegedly Infringing Acts Took Place Outside This District**

Ablaise has asserted U.S. Patent No. 6,961,737 ("the '737 patent"). Although Ablaise has not yet asserted any specific claims against FedEx Corporation or FedEx Services, all claims of the asserted patent recite either a "method for serving pages of viewable data to browsing devices" or "a serving device for serving pages of viewable data to browsing devices." In arguments made before this Court during Markman proceedings in *Dow Jones & Company, Inc. v. Ablaise Ltd.,* Civil Action No. 1:06CV01014, Ablaise stated affirmatively that, with regards to claim 1 of the '737 patent, "[t]he steps of the claim take place entirely on the server side." Danley Decl., ¶ 4, Exh. D, p. 14.  None of the servers for the accused *fedex.com* website are in the District of Columbia; all are located in Tennessee. Miller Decl., ¶ 7.

8

**D.    If Not Dismissed, this Case Should Be Transferred to the Western District of Tennessee Where It Could Have Properly Been Brought by Ablaise**

Regardless of whether this Court finds jurisdiction here, transfer to the Western District of Tennessee is proper under either 28 U.S.C. § 1404(a) or 28 U.S.C. § 1406(a). Venue is proper in the Western District of Tennessee—the home state of both FedEx Corporation and FedEx Services, the site of the documents and witnesses, and the locus of any alleged infringement. Furthermore, the balance between private-interest and public-interest factors tips in favor of transfer to the Western District of Tennessee as discussed in more detail below.

**1.    Private-Interest Factors Favor Transfer**

First, little if any deference should be given to Ablaise's choice of forum given the facts in this case, since Ablaise neither resides in this district nor has any connections to this district other than the other pending lawsuits against it. *See, e.g., Me-Wuk Indian Cmty. v. Kempthorne*, No. 07-412, 2007 WL 3088581 at *6 (D.D.C.) (October 24, 2007) ("[M]any cases in this Circuit recognize that plaintiffs that neither reside in nor have a substantial connection to their chosen forum, are entitled to less deference.") (citing *DeLoach v. Phillip Morris Cos.,*, 132 F. Supp. 2d 22, 24-25 (D.D.C. 2000); *see also Lycos, Inc. v. Tivo, Inc.*, 499 F. Supp. 2d 685, 692 (E.D. Va. 2007) (in granting defendant's motion to transfer, noting that "plaintiff's choice of forum is not entitled to substantial weight if the chosen forum is not plaintiff's 'home forum,' and the cause of action bears little or no relation to the chosen forum").

Plaintiff Ablaise is a British corporation with a principal place of business in London. Ablaise maintains no offices or operating facilities in the District. In fact, Ablaise cites no affirmative ties to the District of Columbia at all, other than it has been sued here before, and now has chosen to file suit against five unrelated companies at the same time even thought the cause of action did not arise here. And the cause of action, if any, relates to actions performed

by servers, which in FedEx Services' case are not in DC. Thus, Ablaise's choice of this forum is not entitled to great deference. *See Me-Wuk*, 2007 WL 3088581 at *6.

Second, defendants' choice of forum—Western District of Tennessee—is clearly more appropriate for any number of reasons. Both FedEx Corporation and the newly-added FedEx Services reside and are subject to personal jurisdiction in Tennessee. Further, any allegedly infringing acts that Ablaise may assert take place on a server located in the Western District of Tennessee, making venue proper in that district, not here. Accordingly, the Western District of Tennessee is a venue in which Ablaise could have brought this action. *See* 28 U.S.C. §§ 1400, 1404(a). Indeed, FedEx Services filed a declaratory judgment action there, indicating FedEx Services' willingness to answer Ablaise's claims in the Western District of Tennessee. Ablaise has no argument why the Western District of Tennessee would be inappropriate other than the fact that it filed first in DC. However, courts very often transfer first-filed actions to another forum where, as here, jurisdiction in the first-filed forum is not available or, even when it is, if it makes sense to do so. *See Electronics for Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1347-48 (Fed. Cir. 2005) (stating that "exceptions [to the first filed rule] are not rare" and that factors to consider include "convenience and availability of witnesses, or absence of jurisdiction over all necessary or desirable parties," among others).

Third, as mentioned above, none of the alleged infringing devices or activities are in the District of Columbia. None of the servers for the accused *fedex.com* website are in the District of Columbia; all are located in Tennessee. Miller Decl., ¶ 7.

Fourth and fifth, the convenience of the witnesses and the parties strongly favors transfer to the Western District of Tennessee, where the largest majority of the FedEx Services' IT employees (close to 3000) reside. Miller Decl., ¶ 3. By contrast, Ablaise has <u>no</u> witnesses in the

District and only two overall.  Danley Decl., ¶ 5, Exh. E, p. 2.  In Rule 26(a) Disclosures in
*Financial Fusion, Inc. v. Ablaise, Ltd.*,[1] another suit in which Ablaise alleges infringement of the
'737 patent, Ablaise has gone on record as having only two witnesses with discoverable
information relevant to this litigation:   the two inventors, Andrew Ritchie and Jonathan
Bradshaw, both of whom reside in Great Britain.  *Id.*  There exists no good reason why these
witnesses cannot fly as easily from London to Memphis as they can to the District of Columbia.
For example, a quick search using the Travelocity™ online search engine indicates that there are
64 daily flights from London to Memphis, many on familiar carriers such as British Airways.
Danley Decl., ¶ 5, Exh. F.  A similar search on available flights from London to the Washington,
DC, area shows 71 daily flights into its two airports.  Danley Decl., ¶ 5, Exh. G.  While there
may be a few more non-stop flights into Washington, DC, than into Memphis, the difference in
travel time is barely three hours.  To quote the Court in *Ricoh Company v. Honeywell*, when
faced with Ricoh's argument that having only one daily flight to Minneapolis that was three
hours longer than the trip to Newark was an inconvenience, "[t]his argument barely deserves a
response."  817 F. Supp. 473, 484 n. 24 (D.N.J. 1993).

Sixth, ease of access to proof also tips in favor of transfer.  Ablaise has little or no
documents.  In its Opposition to FedEx Corporation's Motion to Dismiss FedEx Corporation,
Ablaise disingenuously suggests that its unnamed "proof" will be, at some future time, in the
District of Columbia by virtue of the actions already pending.  [Docket. No. 8, p. 15].  But
Ablaise has already represented in other lawsuits relating to the '737 patent that, while it has not
even looked at the data, it believes that the only documents it has relevant to the '737 patent are

---

[1] *Financial Fusion, Inc. v. Ablaise Ltd. et al.*, C06-02451 SBA, is pending in the U.S.
District Court for the Northern District of California, Oakland Division.

located in the United Kingdom. Danley Decl., ¶ 8, Exh. H. Furthermore, it has refused to search for and produce required documents to the three opposing parties in the related Northern District of California cases. *Id.* We have no reason to believe that Ablaise will act any differently before this Court.

By contrast, all key documents relevant to the development, operation, and maintenance of the *fedex.com* website may be found in or are accessible from Tennessee. Miller Decl., ¶ 6. The servers from which the pages of the *fedex.com* website are served are located in Tennessee. Miller Decl., ¶ 7. The burdens during discovery will almost certainly fall more heavily on FedEx Services, the owner of the accused product, than on Ablaise, the patentee which has already indicated in other related litigations that it has no documents on which it plans to rely.

### 2.    Public-Interest Factors Favor Transfer

*Me-Wuk Indian Community* supports FedEx Corporation's position that this action should be transferred to the Western District of Tennessee. In *Me-Wuk*, the D.C. Court transferred a first-filed action out of the plaintiff's chosen forum to the Northern District of California. *Me-Wuk*, 2007 WL 3088581 at *7. The court held that the interests of justice favored transfer to the district where another related case was pending in part because the first-filed "case has little connection with this District." *Id.* The Court noted that justice favored transfer to California because this was the home of two of the parties and that California "should prove convenient to potential witnesses who may be called in the case." *Id.* That same common sense should apply here as well.

Moreover, keeping both FedEx Corporation and FedEx Services in this lawsuit will not necessarily result in any efficiencies. The accused products and services of the other four defendants are different than the *fedex.com* website. Indeed, Ablaise has not even indicated which claims will be asserted against each party. In addition to defending different products,

depending on which claims Ablaise asserts against each party, the six defendants in this lawsuit may also be considering entirely different sets of claims for invalidity.

Moreover, there is no guarantee that this suit will go forward here against any of the other four defendants, as none of the other defendants have yet answered. Some it appears have not even been served, and may choose to settle before appearing. As a result, this should not be a basis for keeping FedEx Services (or FedEx Corporation) in this lawsuit when jurisdiction and a more convenient forum exists elsewhere.

## III.   CONCLUSION

For these reasons, FedEx Services respectfully requests that the Court grant its motion to dismiss. In the alternative, the suit against FedEx Services and/or FedEx Corporation should be severed and transferred to the Western District of Tennessee under 28 U.S.C. §§ 1404 or 1406 because Tennessee is the only proper forum for resolution of the dispute between these specific parties.

Dated: November 21, 2007

Respectfully submitted,

_____/s/Linda J. Thayer_____
Kenneth W. Curtis (DC Bar #345256)
Linda J. Thayer (DC Bar #464,498)
   (*Admitted Pro hoc Vice*)
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, L.L.P.
901 New York Avenue
Washington, DC  20001-4413
Tel:  (202) 408-4000
Fax:  (202) 408-4400

Attorneys for Plaintiffs
FEDEX CORPORATE SERVICES and FEDEX
CORPORATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABLAISE, LTD., | ) |
|       Plaintiff, | )   Civil Action No.:  1:07-CV-01836 |
| | ) |
| v. | )   Judge James Robertson |
| | ) |
| NAVTEQ CORP., FEDEX CORP., FEDEX | )   [Filed Electronically] |
| CORPORATE SERVICES, GENERAL | ) |
| MOTORS CORP., ALASKA AIR GROUP, | ) |
| INC., AND CIRCUIT CITY STORES, INC. | ) |
| | ) |
|       Defendants. | |

## DECLARATION OF KAREN MILLER

I, Karen Miller, declare as follows:

I am Director of Information Technology for FedEx Corporate Services, also known as

FedEx Services. The statements made herein are based upon my personal knowledge and, if

called on as a witness, I would testify as to the following statements:

1. As of May 31, 2007, FedEx Services had approximately 15,000 employees, of which

    approximately 5081 employees work in the field of Information Technology ("IT").

2. FedEx Services houses its employees in several buildings in and around Memphis

    and the adjoining city of Collierville. For example, some employees have offices at

    3610 Hacks Cross Road, Memphis, while others have offices at 70 FedEx Parkway,

    Collierville, less than five miles away.

3. The largest majority of the FedEx Services IT employees (close to 3000) are resident

    in Tennessee.

4. Key FedEx Service employees having knowledge regarding the development,

    operation, and/or maintenance of the *fedex.com* website are resident in Tennessee.

5. Key FedEx Services management personnel who have responsibility for the *fedex.com* website, such as the Senior Vice President of IT, the Vice President of IT, and me, the Director of IT, are all resident in Tennessee.

6. All key documents relevant to the development, operation, and maintenance of the *fedex.com* website may be found in or are accessible from Tennessee.

7. The servers from which the pages of the *fedex.com* website are served are located in Tennessee.

8. None of the FedEx Corporate Services employees responsible for the *fedex.com* website are resident in DC.

9. None of the FedEx Corporation employees in the DC office perform services related to the accused *fedex.com* website.

10. FedEx Corporation uses the *fedex.com* website only to display information about the company itself, its corporate officers, and information of interest to its investors. The portions of the *fedex.com* website providing information about FedEx Corporation are not interactive in the sense that users may purchase products or services.

11. The "direct purchase of stock" is not available through the *fedex.com* website. Potential investors are provided with information such as charts and quotes relating to the FDX stock, and information on how to purchase stock, but users cannot actually purchase stock directly from FedEx Corporation or any other FedEx company through the *fedex.com* website.

12. To purchase stock, users are directed to contact third party Compushare at an address in Rhode Island. While a link is provided to the Compushare website, the *fedex.com*

2

website very clearly cautions: "**Important:** The Web site to which you are being provided a link above is not part of the FedEx Web site. This link is provided for your convenience only."

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 13rd day of November 2007, at 10 FedEx Parkway, 2nd Fl., Collierville, TN 38017.

Karen Miller

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ABLAISE, LTD., | ) | |
| Plaintiff, | ) | Civil Action No.: 1:07-CV-01836 |
| | ) | |
| v. | ) | Judge James Robertson |
| | ) | |
| NAVTEQ CORP., FEDEX CORP., FEDEX | ) | [Filed Electronically] |
| CORPORATE SERVICES, GENERAL | ) | |
| MOTORS CORP., ALASKA AIR GROUP, | ) | |
| INC., AND CIRCUIT CITY STORES, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF JEFFREY DANLEY

I, Jeffrey Danley, declare as follows:

I am an attorney at Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., counsel for

FedEx Corporation and FedEx Corporate Services in this case. I am admitted to practice law in

California. If called upon to do so, I can competently testify to the matters stated herein on

personal knowledge.

1.     Ablaise could have verified that *fedex.com* is registered to FedEx Services, not

FedEx Corporation, by checking the public online records of the registrar,

Network Solutions, at http://www.networksolutions.com/whois/ index.jsp.

Exhibit A is a true and correct copy of WHOIS domain registration information

results for fedex.com dated November 13, 2007. On page 1 of these results, it

states that the database was last updated on June 28, 2006.

2.     FedEx Corporation has approximately 260-270 employees, the vast majority of

whom are resident in Tennessee. Exhibit B is a true and correct copy of a

declaration executed by Christine P. Richards, current Executive Vice President

and General Counsel for FedEx Corporation, on November 3, 2006, and

submitted to the court in *Ronald A. Katz Technology Licensing, L.P. v. American Airlines, Inc. et al.,* Case No. 2-06CV-334, in the Eastern District of Texas, Marshall Division.

3.  Of the 260-270 FedEx Corporation employees, only twelve employees (four of whom are administrative assistants) work in the Government Affairs office in the District of Columbia.  Exhibit C is a true and correct copy of the organizational chart for the DC office of FedEx Corporation, which FedEx Corporation provided to our firm.  As shown on Exhibit C, the Government Affairs Office is run by Ms. Gina Adams, Corporate Vice President of Government Affairs.  Ms. Kristin Krause, is Manager of Communications for Legal and Regulatory Affairs.  These employees all conduct business related to federal or government affairs.

4.  Exhibit D is a true and correct copy of Ablaise's Responsive Markman Brief [Docket No. 20], as filed with this Court on April 4, 2007, in the two related *Dow Jones litigations*, Civil Action Nos. 1:06CV01014 and 1:06CV01015.

5.  Exhibit E is a true and correct copy of the Rule 26(a) Disclosures submitted by Ablaise in *Financial Fusion, Inc. v. Ablaise Ltd. et al.*, C06-02451 SBA, which is pending in the U.S. District Court for the Northern District of California, Oakland Division.  Ablaise asserts infringement of the same patent, U.S. Patent No. 6,961,737, in that litigation.  On page 2, Ablaise represents that it has only two witnesses likely to have discoverable information:  the two inventors, Mr. Andrew M. Ritchie and Mr. Jonathan M. Bradshaw.  On page 4, Ablaise represents that any documents it may have are at the "locations listed above for Messrs. Ritchie and Bradshaw."

6.    Exhibit F is a true and correct copy of results of a search for daily flights between London and Memphis using the Travelocity™ online search engine.

7.    Exhibit G is a true and correct copy of results of a search for daily flights between London and Washington, DC (either Dulles or National) using the Travelocity™ online search engine.

8.    Exhibit H is a true and correct copy of a letter dated October 10, 2007, received by Linda J. Thayer of my firm in *Financial Fusion, Inc. v. Ablaise Ltd. et al.* In the letter, counsel for Ablaise represents that it has not reviewed electronic media stored at some undisclosed location in the United Kingdom. Ablaise claims that this unreviewed electronic media "may" contain documents relating to Patent Local Rule 3.2, which requires patentees to produce documents related to conception and reduction to practice, design and development of each claimed invention, and evidence of sales or offers to sell any claimed invention.

9.    Exhibit I is a true and correct copy of a letter dated October 10, 2007, sent to counsel for Yodlee in *Yodlee v. Ablaise Ltd.,* Civil Action No. C06-7222 SBA, and Bank of America in *Ablaise Ltd. v. Bank of America*, Civil Action No. C07-01995, two cases that have been related to *Financial Fusion, Inc. v. Ablaise Ltd. et al.* in the Northern District of California. All three parties received the same letter dated October 10, 2007.

10.   Exhibit J is a true and correct copy of a letter dated October 22, 2007, to Ablaise's counsel objecting to Ablaise's refusal to produce responsive documents as required under the Patent Local Rules of the Northern District of California and,

3

in light of its refusal, asking Ablaise to stipulate that it will not assert an invention earlier than the filing date of its patent applications.

11.     Exhibit K is a true and correct copy of a letter from Ablaise's counsel dated October 26, 2007, in which it chooses to stipulate that it will not rely on such documents for priority rather than review and produce any documents it may have.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 21st day of November 2007, at 3300 Hillview Ave., Palo Alto, CA  94304.

_____s/Jeffrey Danley_____

# Exhibit A

WHOIS domain registration information results for fedex.com from Network Solutions    Page 1

## NetworkSolutions.

Login

Customer Service
Call us toll free

Your cart is empty

## WHOIS Search Results

### Your WHOIS Search Results



**fedex.com**
Services from Network Solutions:

Certified Offer Service - Let us help you get this domain name!
Backorder - Try to get this name when it becomes available.
Private Registration - Keep personal information for this domain private.
SSL Certificates - Get peace of mind with a secure certificate.

Visit AboutUs.org for more information about FEDEX.COM AboutUs: FEDEX.COM

Registrant:                                    Make this info private
FedEx Services
70 FedEx Parkway
Collierville, TN 38017
US

Domain Name: FEDEX.COM

Administrative Contact , Technical Contact :
FedEx Services
dns-admin@network.fedex.com
70 FedEx Parkway
Collierville, TN 38017
US
Phone: 901-263-4898
Fax: 999 999 9999

Record expires on 29-Nov-2010
Record created on 26-Feb-1991
Database last updated on 28-Jun-2006

Domain servers in listed order:              Manage DNS

GRACE.FEDEX.COM                              199.81.193.100
L4.NSTLD.COM                                 192.41.162.33
A4.NSTLD.COM                                 192.5.6.33
F4.NSTLD.COM                                 192.35.51.33
G4.NSTLD.COM                                 192.42.93.33

Show underlying registry data for this record

**SAVE over 70%**
when you TRANSFER
your domains to
Network Solutions — your
trusted domain name provider!

Go

Choose Your Domain Name
Provider Wisely and Transfer
Domains for $9.99/yr

Learn the do's and don'ts of
search engine optimization.
Download our *Guide to Getting
Found Online* now.

Learn the Secrets
of **Search Engine
Optimization**

Attend our
**SEO Seminar**

Learn More

Search Engines

TOP SECRET

When you register a domain name, current policies require that the contact information for
your domain name registration be included in a public database known as WHOIS. To learn
about actions you can take to protect your WHOIS information visit
www.internetprivacyadvocate.org.

NOTICE AND TERMS OF USE: You are not authorized to access or query our WHOIS
database through the use of high-volume, automated, electronic processes or for the
purpose or purposes of using the data in any manner that violates these terms of use. The
Data in Network Solutions' WHOIS database is provided by Network Solutions for
information purposes only, and to assist persons in obtaining information about or related to
a domain name registration record. Network Solutions does not guarantee its accuracy. By

WHOIS domain registration information results for fedex.com from Network Solutions    Page 2

| | |
|---|---|
| **Current Registrar:** | NETWORK SOLUTIONS, LLC. |
| **IP Address:** | 199.81.198.50 (ARIN & RIPE IP search) |
| **IP Location:** | US(UNITED STATES)-TENNESSEE-COLLIERVILLE |
| **Record Type:** | Domain Name |
| **Server Type:** | Other 6 |
| **Lock Status:** | clientTransferProhibited |
| **Web Site Status:** | Active |
| **DMOZ** | 21 listings |
| **Y! Directory:** | see listings |
| **Secure:** | Yes |
| **E-commerce:** | Yes |
| **Traffic Ranking:** | 4 |
| **Data as of:** | 28-Nov-2006 |



think local.com

Help your customers find you. Take advantage of a free ThinkLocal listing today!

Join Now!

It's smart to ThinkLocal™

Search ➤

**SEARCH AGAIN**

**Enter a search term:**

e.g. networksolutions.com

**Search by:**
◉ Domain Name
○ NIC Handle
○ IP Address

# Exhibit
# B

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| RONALD A. KATZ TECHNOLOGY LICENSING, L.P., | § § § | |
| Plaintiff, | § § | CASE NO. 2-06CV-334 (DF) |
| v. | § § | Jury Trial Demanded |
| | § | |
| AMERICAN AIRLINES, INC.; AMERICAN BEACON ADVISORS, INC.; FEDEX CORPORATION; FEDERAL EXPRESS CORPORATION; FEDEX CORPORATE SERVICES, INC.; FEDEX CUSTOMER INFORMATION SERVICES, INC.; HILTON HOTELS CORPORATION; HILTON RESERVATIONS WORLDWIDE, LLC; HILTON HHONORS WORLDWIDE, LLC; MARRIOTT INTERNATIONAL, INC.; MARRIOTT WORLDWIDE RESERVATION SERVICES, LLC; NATIONAL RAILROAD PASSENGER CORPORATION, DBA AMTRAK, | § § § § § § § § § § § § § § § § § | |
| Defendants. | § | |

## DECLARATION OF CHRISTINE P. RICHARDS

I, Christine P. Richards, declare as follows:

I am Executive Vice-President, General Counsel, and Secretary for FedEx Corporation. The statements made herein are based upon my personal knowledge, and if called on as a witness, I would testify as to the following statements:

1. FedEx Corporation is a publicly traded parent company of over 100 companies throughout the world. FedEx Corporation has about 260-270 employees, including paralegals, attorneys, finance professionals, project management support professionals, human resource professionals, security professionals, the Chief Executive Officer, the Chief Financial Officer, the Chief Information Officer, the General Counsel, the Executive Vice President of Marketing and Corporate communications and their associated staff and/or assistants.

2. FedEx Corporation's employees and officers are not aware of the specific types of technology that are used in providing the automated telephone systems ("accused systems") identified in paragraph 63 of Plaintiff Ronald A. Katz Technology Licensing, L.P.'s Complaint for Patent Infringement ("RAKTL's Complaint"), and alleged to infringe patents allegedly owned by RAKTL. FedEx Corporation does not decide what technology is to be used in providing these systems. FedEx Corporation does not manage the day-to-day operations of its subsidiaries Federal Express Corporation, FedEx Corporate Services, Inc., and FedEx Customer Information Services, Inc. FedEx Corporation has its own articles of incorporation, by-laws, and meetings, and it maintains its own financial records.

3. FedEx Corporation does not make, use, import, offer to sell, and/or sell any of the accused systems, nor does it operate any automated telephone systems. FedEx

Corporation does not use the accused systems in the operation of its business, and it does not direct their use in any respect.

4.   FedEx Corporation does not have any customers, and therefore does not "allow [any] customers to perform purchasing, ordering, parcel-tracking, delivering, receiving, confirmation and other functions over the telephone" as alleged in paragraph 63 of RAKTL's Complaint.

5.   Based on RAKTL's Complaint, FedEx Corporation is informed and believes that the complaint names subsidiaries or affiliates of FedEx Corporation that allegedly make, use, offer to sell or sell the accused systems, and the named subsidiaries or affiliates maintain their own financial records.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 3rd day of November 2006, at 942 South Shady Grove Rd, Memphis, Tennessee 38120.

Christine P. Richards

# Exhibit C

FedEx People Directory - Organization Chart

## Organization Chart                                                    Page 1 of 1



| Gina F. Adams |
| CVP Government Affairs |

| Monique E. Adams | Patricia A. Daniel Cummings | Ann S. Dickey |
| Admin Asst-Legal | Exec Asst-CVP/DC | Staff VP Government Aff |

| Nazarene V. Hill | Gerald F. Hughes | Yealio T. Kamara |
| Exec Asst-CVP/DC | Sr Federal Affairs Rep | Mgr Government Affairs |

| Cheryl C. Keever | Kristin S. Krause | David H. Pryor |
| Admin Asst/Legal DC | Mgr Comm, Legal/Reg Aff | Sr Federal Affairs Rep |

| Kathryn L. Rand | Richard F. Rodgers |
| Sr Federal Affairs Rep | Staff VP Government Aff |

# Exhibit D
# Part 1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DOW JONES & COMPANY, INC.  )<br>200 Liberty Street  )<br>New York, New York 10281  )<br>  )<br>Plaintiff,  )<br>  )<br>v.  )<br>  )<br>ABLAISE LTD. ("Ablaise")  )<br>40 Queen Anne Street  )<br>London W1G 9EL  )<br>United Kingdom  )<br>  )<br>and  )<br>  )<br>GENERAL INVENTIONS  )<br>INSTITUTE A, INC., ("GIIA")  )<br>Craigmuir Chambers  )<br>P.O. Box 71  )<br>Town Road  )<br>Tortola, British Virgin Islands  )<br>  )<br>Defendants.  )<br>_____  )<br>  )<br>DOW JONES REUTERS  )<br>BUSINESS INTERACTIVE, LLC  )<br>200 Liberty Street  )<br>New York, New York 10281  )<br>  )<br>Plaintiff,  )<br>  )<br>v.  )<br>  )<br>ABLAISE and GIIA  )<br>  )<br>Defendants.  )<br>_____  )| **Civil Action No. 1:06CV01014**<br><br>**Judge James Robertson**<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**Civil Action No. 1:06CV01015**<br><br>**Judge James Robertson** |

**ABLAISE LTD. AND GENERAL INVENTIONS INSTITUTE A, INC.'S
RESPONSIVE MARKMAN BRIEF IN SUPPORT OF ITS
PROPOSED CLAIM CONSTRUCTION**

DC1 45695325.1

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

I.    BACKGROUND OF THE INVENTION ....................................................2

    A.    Delivering Web Pages Over the Internet ..........................................3

    B.    The State of the World Wide Web Prior to the Invention ..................5

    C.    The History of Ablaise and The Invention of Custom Formatted Web Pages ........................................................................7

II.    Legal Standards of Patent Claim Construction ...........................................10

    A.    Focus on the Claim Language and Accord Terms Their Plain and Ordinary Meaning to One of Ordinary Skill in the Art. ....................11

    B.    It is Improper to Read Limitations From the Specification Into the Claims. ........12

    C.    The Prosecution History Does Not Carry the Same Weight as the Specification. ..............................................................13

III.    Construction of Claim Terms in Claim 1 of the '737 Patent ........................14

    A.    "Displayed at a browsing device" ...................................................14

    B.    "Storing executable functions" .......................................................17

        1.    Storing does not mean storing a universal set of all available functions. ..............................................................18

        2.    Functions need not be named, merely identified. ..................19

        3.    A function need not when executed, create a portion of code. ...................20

    C.    "In response to identifying a request for specified content data and a user identifier; (a)...(e)..." ......................................................21

    D.    "Receiving format identifiers identifying the type of formatting required" ........22

        1.    "*Receiving* format identifiers" .............................................22

            a.    The claim language is unambiguous, and not limited to receiving the format identifiers in the request. .............................23

            b.    The specification includes at least two embodiments to support the plain meaning of the claims. ......................24

            c.    The file history does not alter the plain meaning of the claims. ..............................................................26

        2.    "format identifiers" .............................................................29

        3.    "type of formatting" ...........................................................31

    E.    "Selecting a set of stored functions in dependence upon a received format identifier and said read user information." ..........................32

1.     "Choosing" is not the plain and ordinary meaning of "Selecting" in the context of selecting computer functions. ..............................................34

2.     A "set of functions" is not limited to an "indexed function string from a set of stored and indexed function strings." .................................35

3.     The claim language does not state that the "format identifier is included in said identified request for specified content data." .................36

F.     "Executing said set of functions to generate viewable data comprising said selected content data and formatting data" .................................................36

IV.     Construction of Claim Terms in Claim 1 of the '530 Patent .............................................37

A.     "Identifying requests from browsing devices that define a request for specified viewable data, said request including formatting type identification data" ...............................................................................................38

B.     "Maintaining a plurality of formatting types of data defining respectively corresponding predetermined formats for portions of said viewable data" ..........40

1.     "Formatting types of data" ...........................................................................40

2.     "Maintaining" does not require "maintaining in a table." .........................42

C.     "Selecting a specific one of said types of formatting data in response to said formatting type identification data" ...............................................................43

CONCLUSION ...............................................................................................................................43

## TABLE OF AUTHORITIES

**Page**

**Cases**

ACTV, Inc. v. The Walt Disney Co.,
  346 F.3d 1082 (Fed. Cir. 2003) ...................................................... 12, 23

Catalina Mktg. Int'l v. Coolsavings,com, Inc.,
  289 F.3d 801 (Fed. Cir. 2002) ............................................................. 16

CollegeNet, Inc. v. ApplyYourself, Inc.,
  418 F.3d 1225 (Fed. Cir. 2005) ............................................................ 12

Ferguson Beauregard/Logic v. Mega Systems,
  350 F.3d 1327 (Fed. Cir. 2003) ....................................................... 12, 19

Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,
  381 F.3d 1111 (Fed. Cir. 2004) ............................................................ 11

Johnson Worldwide Assoc., Inc. v. Zebco, Corp.,
  175 F.3d 985 (Fed. Cir. 1999) ............................................................. 12

Kim v. ConAgra Foods, Inc.,
  465 F.3d 1312 (Fed. Cir. 2006) ............................................................ 24

Liebel-Flarsheim Co. v. Medrad, Inc.,
  358 F.3d 898 (Fed. Cir. 2004) ......................................................... 13, 24

N. Telecom Ltd. v. Samsung Elec. Co.,
  215 F.3d 1281 (Fed. Cir. 2000) ....................................................... 13, 33

Pfizer, Inc. v. Teva Pharms. USA, Inc.,
  429 F.3d 1364 (Fed. Cir. 2005) ............................................................ 12

Phillips v. AWH Corp.,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ............... 11, 12, 14, 19, 24, 26, 34, 35

Rambus, Inc. v. Infineon Techs. AG,
  318 F.3d 1081 (Fed. Cir. 2003) ............................................................ 13

SRI Int'l, Inc. v. Matsushita Elec. Corp.,
  775 F.2d 1107 (Fed. Cir. 1985) ..................................................... 13, 23, 32

Teleflex, Inc. v. Ficosa N. Am. Corp.,
  299 F.3d 1313 (Fed. Cir. 2002) ...................................................... 13, 18, 26

Vitronics Corp. v. Conceptronic, Inc.,
   90 F.3d 1576 (Fed. Cir. 1996) ............................................................................ 11

**Other Authorities**

Computer Dictionary, Microsoft Press, 179 (2d ed. 1994)..................................... 19, 32

IBM Dictionary of Computing, 1994............................................................ 19, 29, 32

## INTRODUCTION

Ablaise Limited ("Ablaise") respectfully submits this Memorandum in support of its proposed construction of disputed claim terms of claim 1 of each of the patents in suit, United States Patent No. 6,295,530 ("The '530 Patent") and 6,961,737 ("The '737 Patent"). In this brief, Ablaise provides the Court with an overview of the relevant web page delivery technology, the history of the company and the invention of custom formatted web pages. As the Court will see, the '530 patent and '737 patent claim related but different ways to customize the look of a web page for someone using the Internet. Ablaise then provides the Court with the plain and ordinary meaning of the disputed patent claim terms to one of ordinary skill in the art at the time of the invention. Ablaise's definitions are supported by the claim language itself, the specification, the file history and, should the Court require it, extrinsic evidence including expert testimony.

Dow Jones & Company Inc. ("Dow") has taken a fundamentally different and incorrect approach. Dow argues that the patents-in-suit are invalid or not infringed. This result-oriented approach is not unusual, but in this case it has caused Dow to ignore many of the basic canons of claim construction. For instance, Dow repeatedly avoids any attempt to ascertain the plain and ordinary meaning of the terms actually present in the claims, and instead simply adds words or phrases describing the details of the preferred embodiment. By way of example, Dow construes the phrase "type of formatting" to mean "indexed function string." A type of formatting is essentially one way for a web page to look. The language "indexed function string" is not even an example of a type of formatting, but simply reads the minute details of the computer processing described in the preferred embodiment into the claim. Ablaise respectfully requests that the Court reject Dow's approach of rewriting the claims at the level of detail in the

-1-

specification. Instead, the disputed claim terms should be construed as they would be understood by one of ordinary skill in the art in light of the specification.

**I.    BACKGROUND OF THE INVENTION**

In general terms, the '530 and '737 patents provide a method for specialized computers commonly referred to as "web servers" to automatically respond to how people using the World Wide Web want information on a particular web page to look. Prior to the invention, only web page programmers could dictate the look of the web pages their web servers sent out over the web. Thus, a user could retrieve a particular web page, and in rare circumstances even customize the content on that web page, but the user could not define the look and format of the content on the web page. The inventors believed it would be superior to identify what Web users wanted and to provide automatically customized web pages. They invented the technique of allowing a web server to keep track of different formats for different internet users through the use of "format identifiers" thereby allowing users to control the look of web pages without the involvement of a computer programmer.

The inventors' computerized method of delivering web pages could have many capabilities, but there are two keys to achieving the results of the claimed inventions. First, the inventors separated the information on the web page from where it appears or how it looks. The information itself is usually text or graphics and is called "content." Where the information appears or how it looks is called "format." The inventors made format independent of "content" so that the same content could be sent to different users in different formats. Second, they conceived of using a format identifier to determine the format for a particular user. The choice of one format over another is based on information that comes from an external source to the computer generating the web page.

**A.     Delivering Web Pages Over the Internet**

The Internet is a global network of computers that allows computers to communicate with each other. The Internet is the delivery mechanism for many different methods of communication. One of the most well-known methods of communications over the Internet today is the delivery of web pages over the World-Wide Web.

The delivery of web pages is usually completed by communication between a "browser" and a "server." Users can view or "browse" web pages by using a "browser." A browser is a computer software program that is capable of sending a request for a web page. The server responds to the request by returning a file corresponding to the page requested by the browser. A browser is also capable of interpreting the file returned from the server and displaying it to a user.

Web pages must conform to standard types of formatting languages called "markup languages." These standard markup languages consist of instructions that allow people to write content that can be specially formatted and viewed by others regardless of the type of operating system (e.g., Windows or Macintosh) or hardware that the user is running. If files returned to a web browser from a server contain these standard markup instructions, the web browser is able to parse or interpret the markup file and display content such as text and/or graphics in a particular format. Rosenbloom Decl. Exh. A, at Col. 3, ll. 18-38.

The most common markup language used in web pages is the HyperText Markup Language known by its acronym "HTML." HTML is used to format the content on a web page in a particular way. It accomplishes this by surrounding certain content with special codes referred to as "tags." Most "tags" correspond to a particular style of formatting. Tags typically come in pairs: an open tag and a close tag. For instance, if a programmer writing a webpage wished to place the phrase "Hello World" in a heading format (e.g., larger text size and bolded)

using HTML, she would write the following "<H1>Hello World</H1>" into a file called the HTML source file. See, e.g., Rosenbloom Decl. Exh. A, Fig. 8, ll 4. In this example, the "<H1>" is an open heading tag and the "</H1>" is a close heading tag. Any content between the open heading tag and the close heading tag will be displayed in a larger text size and bolded when a browser displays that particular page.

 The examples visually shown on the following page illustrate how HTML tags format a web page. Example One shows content that does not include formatting HTML tags. The page on the left is the HTML source file. The page on the right shows how a browser renders that HTML file. As you can see, the content in Example One is not displayed in any special format. Example Two illustrates how that same content looks when heading tags are used in the HTML source file. Now you can see in the browser window that the format of the content has changed. The text has increased in size and the text is now bold. Likewise, Example Three shows what happens to the content when it is placed in both heading tags and center tags. This has the effect of changing the location of the content displayed at the browser. In particular, the large bold text is now centered within the browser window.

**Example One - No HTML Tags**




HTML Source File                    HTML File Displayed in Browser

**Example Two - Heading HTML Tags**




HTML Source File                    HTML File Displayed in Browser

**Example Three - Heading & Center HTML Tags**




HTML Source File                    HTML File Displayed in Browser

As you can see from these examples, a programmer can cause a browser to display the same content in different formats by altering HTML tags in the HTML source file.

**B.    The State of the World Wide Web Prior to the Invention**

The Web has undergone a remarkable transformation over its short history.  For example, the Web had only 18,957 web servers in August of 1995 and now has over 100 million web

servers. (Hicks Aff. ¶ 20.) At the time of the invention, in 1995, the Web was in its earliest stages of development. Unlike the highly dynamic and rich web pages available today, most web pages at the time of the invention consisted of "static" content and formatting defined exclusively by web developers, who wrote the HTML files by hand. Rosenbloom Decl. Exh. A at Col. 4 ll. 23-49. Users could not send a request to a web server to change either the content displayed or the layout. A user could contact the web developer who would then have to recreate the page by hand in accordance with the user's request—often abandoning the previous version of the document. Although relatively rare, some web pages during this time period were dynamically created "on the fly" with content from databases or some other external source.[1] (Hicks Aff. ¶ 19.) The more common static web pages merely consisted of preset HTML files served to requesting users. Dynamic web pages consisted of an HTML file built in response to a request. The prior art taught that a dynamic web page could be built by a computer program, such as are typically located within a CGI-BIN, which could be started by a web server that has received a request for specific request for content. Data from such a request was fed into the computer program which would then process a series of instructions that would result in lines of HTML being written until an entire HTML document was created to be delivered to the requesting browser. The result was a web page that could deliver different content in the same format. (Hicks Aff. ¶ 19.)

---

[1] Dow mischaracterizes the invention by attempting to paint the patent claims as broadly extending to any dynamic web page. Dow Br. at 9. The claim language itself clearly limits the invention to dynamically altering the format of a web page in dependence upon format preferences. Ablaise, in fact, explicitly stated this to the PTO:

> Applicant has described and claimed an arrangement whereby two different clients requesting the same content data from the same server may receive differently formatted versions of that same content data depending upon a particular format identifier received from each respective client at the server.

'737 File History Amendment dated December 16, 2003, p. 13. Thus, different formatting based on either a format identifier or format identification type data is the key. Dynamically creating web pages with the same formatting for all users is not claimed.

The prior art, however, still suffered from the lack of functionality that allowed a user of the system to control the layout or formatting of the content—dynamically generated or not—on the page. For example, while Dow relies on the prior art Fishwrap reference to show that dynamic content generation was known in 1995, Fishwrap lacked customized formatting— functionality that users explicitly were requesting. See, e.g., Rosenbloom Decl. Ex. N, at 25-26.

Customizing the format of web pages presented a substantial burden on the web developers prior to the invention. If, for example, one user needed data organized one way and another user needed a different format for the same data, the web developer would have to create two separate pages, each requiring technical skill to create. As the number of requests for specific layouts multiplied, the number of pages required would grow exponentially until the effort to facilitate the users' requests became prohibitive. Rosenbloom Decl. Exh. A at Col. 4, ll. 57-66. The invention disclosed by the '530 and '737 patents overcame these and other problems.

**C.    The History of Ablaise and The Invention of Custom Formatted Web Pages**

Inventors Andrew Ritchie and Jon Bradshaw are both individuals with extensive experience in computer network applications. (Ritchie Aff. ¶¶ 1, 5.) They developed a flexible method for customizing, formatting, and delivering web pages in order to grow a web development business. That commercially successful invention is the basis of the '530 and '737 patents.

During the spring of 1994, Mr. Ritchie was approached by someone interested in creating an online version of a large U.K.-based retail catalog called Freemans. (Ritchie Aff. ¶ 2.) Mr. Ritchie realized that creating a web page for each product in the catalog was unmanageable, because it would require the creation of nearly 10,000 static web pages. (Id. ¶ 3.) After considering several solutions, Mr. Ritchie decided that he could use a web server to create each of the catalog pages "on the fly" each time a user requested the page. (Id. ¶ 4.) More importantly,

this decision led Mr. Ritchie to the realization that he could also "utilize identification information sent from a browsing device to customize the web page created by the server to fit the needs and preferences of the users requesting the information." (<u>Id</u>.)

Mr. Ritchie called upon his friend, Jon Bradshaw, to help develop this new technology as part of a new business that they founded called Point4 Consulting Ltd. (<u>Id</u>. ¶¶ 5-6.) During the Winter of 1994-1995, Mr. Ritchie and Mr. Bradshaw built an internet application "that allowed a server to create web pages on-the-fly in response to identifiers that identified the content and/or format preferred by the user." (<u>Id</u>. ¶ 6.) Mr. Ritchie and Mr. Bradshaw built and sold many web-based applications to many large organizations in the United Kingdom that utilized some form of this "on-the-fly" web page creation technology. (<u>Id</u>. ¶¶ 7-8.)

Ritchie and Bradshaw always retained ownership of their patents, but along with the other shareholders, sold Point4 to Nettec PLC. (<u>Id</u>. ¶ 9.) They licensed their technology to Nettec for 3 years. (<u>Id</u>.) Ritchie, Bradshaw and most of the other Point4 shareholders also formed Ablaise in 2002 to license the patents to other companies. (<u>Id</u>. ¶ 10) Since then, several large companies have agreed to take a license on the patents, including Dell, Citigroup, and E*Trade Financial. (<u>Id</u>. ¶ 12.)

In addition to commercializing their technology, Mr. Ritchie and Mr. Bradshaw also decided to protect their intellectual property and apply for a patent. The inventors disclosed their method in detail in a patent application in the U.K. on May 15, 1995 including the required "best mode" of practicing the various aspects of method. The inventors filed in the U.S. on May 15, 1996 and were eventually granted two U.S. patents related to dynamically generating web pages in a preferred format, the '737 patent and the '530 patent.

The method the inventors disclosed to the patent office could generate web pages "on-the-fly" taking into account *both* content preferences and format preferences. In other words, they were not limited to serving static web pages in response to a request, but could deliver different content, and could format that content differently, depending upon information in the request and/or stored information about a user making the request relating to "a specified page format." Rosenbloom Decl. Exh. A at Col. 5, ll. 7-20. The system accomplishes this task by feeding format, user, and/or content preferences into a computer program. This computer program then executes a series of instructions that select between various content and formatting tags and places the selected data within a particular portion of a markup file to be delivered to a user's browsing device. Id. at Col. 8, ll. 34-44, Col 14, ll. 41-46. In effect, the system is capable of executing different instructions to select and write different formatting tags to the HTML document in response to different formatting preferences of a user. Id. at Col. 15, ll. 31-34, 54-56, 63-67 - Col. 16, ll. 1-7. The result is a more flexible web page capable of delivering either the same or different content paired with potentially different specified formats for the location of presentation the content. Id. at Col. 7, ll. 23-37.

The Summary of the Invention describes a method for serving viewable data "in accordance with a specified page format" wherein "HTML output instructions are generated 'on-the-fly' in response to requests." Id. at Col. 5, l. 12, 22-24 (emphasis added). As the Summary further explains, "any type of data" may be served, id. at Col. 5 l. 32. The invention, however, allows the system to intelligently select specific formatting markup instructions for a markup document to control the look of a web page in dependence upon a user's preference for the overall layout of the page. Id. at Col. 5 l. 38-42; Id. at Col. 8, ll. 34-44.

The specification describes two ways to identify format preferences: (1) from data in the request for a page; and (2) from a user database. For instance, in describing one embodiment the specification states, "[t]he URL will include an element identifying the data required [and] an element identifying the type of formatting required." Id. at Col. 14 ll. 3-5. In that case, the format preference comes with the request. Later, the specification describes how all data is processed in the preferred embodiment to generate pages on the fly including formatting tags, text data and graphics data where the formatting preferences are stored on the system. See, e.g., Id. at Col. 15, ll. 6-34. In essence, the system is able to "adjust[] the way in which the data is actually formatted" by "adjust[ing] the relationship between indexes and strings" that reference computer instructions, that when executed, select and write formatting tags within the delivered markup file, Id. at Col. 15, ll. 31-34, on the basis of "information read from the user database." Id. at Col. 16, ll. 8-14. The claimed inventions, therefore, include the ability to generate web pages on the fly in accordance with a user preferred format derived from the request or received from a component of the system such as a user database.

The patents-in-suit claim the invention in different ways. In general, the '530 patent claims receiving a request for a web page from a browser including data identifying the preferred format, such that the requested content may be provided in at least two different formats to that browser depending upon identification data in the request. The '737 patent claims storing user preferences in a database such that, in response to a request for a web page, preferred content may be returned and a preferred format applied to that content depending upon the request and the user making the request.

## II.     LEGAL STANDARDS OF PATENT CLAIM CONSTRUCTION

Claim construction is the process by which this Court discerns the meaning of a party's claims, and thus what it owns. In its opening brief Dow provided the Court with some of the

basic canons of claim construction and Ablaise will not burden the Court with repetition. However in its discussion of the law, and correspondingly throughout the brief, Dow downplayed the most basic canon: that the claim language defines the invention and the claim terms are to be accorded their ordinary and customary meaning to those of skill in the art. Dow ignored altogether the canon prohibiting courts from reading limitations from the specification into the claims. Finally, Dow overstated the role of the file history. The law on these three points is important to the Court's determination of claim construction in this case.

**A.    Focus on the Claim Language and Accord Terms Their Plain and Ordinary Meaning to One of Ordinary Skill in the Art.**

The words of a claim "are generally given their ordinary and customary meaning." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citing Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Phillips, 415 F.3d at 1312. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." Id. at 1314. Even in more complicated cases, the inquiry is an objective one, in which the court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean. Id. "Those sources include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004) ). Extrinsic evidence can

include expert testimony on the background of the technology at issue, how a claimed invention works and the knowledge and understanding of persons skilled in the art. Id. at 1318; Pfizer, Inc. v. Teva Pharms. USA, Inc., 429 F.3d 1364, 1374 (Fed. Cir. 2005) (expert testimony supported conclusion on understanding of persons in the art).

Throughout the process of determining the ordinary and customary meaning, the focus must remain on the claims. According to the Federal Circuit, "[q]uite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms." 415 F.3d at 1314. Indeed, proper claim construction requires interpretation of the entire claim in context, not a single element in isolation. ACTV, Inc. v. Walt Disney Co., 346 F.3d 1082, 1090 (Fed. Cir. 2003). "For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." Phillips, 415 F.3d at 1314-15. Similarly, general descriptive terms will ordinarily be given their full meaning, and modifiers will not be added to broad terms standing alone. Johnson Worldwide Assoc., Inc. v. Zebco, Corp., 175 F.3d 985, 989 (Fed. Cir. 1999).

**B.    It is Improper to Read Limitations From the Specification Into the Claims.**

While the person of ordinary skill in the art is deemed to read the claim term in the context of the claims as well as the specification, Ferguson Beauregard/Logic v. Mega Systems, 350 F.3d 1327, 1338 (Fed. Cir. 2003), in examining the specification, the Court must not at any time import limitations from the specification into the claims. CollegeNet, Inc. v. ApplyYourself, Inc., 418 F.3d 1225, 1231 (Fed. Cir. 2005). As the Federal Circuit has explained,

> [C]laims are infringed, not specifications. . . . If everything in the specification were required to be read into the claims, or if structural claims were to be limited to devices operated precisely

as a specification-described embodiment is operated, there would be no need for claims . . . It is the claims that measure the invention.

SRI Int'l, Inc. v. Matsushita Elec. Corp., 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc).

The foundation of this rule is the basic understanding that the law of patenting is intended to be reasonable. In other words, "[t]he law does not require the impossible. Hence, it does not require that an applicant describe in his specification every conceivable and possible future embodiment of his invention." Id. Thus, "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004).

### C.    The Prosecution History Does Not Carry the Same Weight as the Specification.

As with the specification, the prosecution history limits the ordinary meaning of a claim term only where the patentee excludes certain subject matter "with reasonable clarity and deliberateness." N. Telecom Ltd. v. Samsung Elec. Co., 215 F.3d 1281, 1294-95 (Fed. Cir. 2000). In other words, the applicant must use "words or expressions of manifest exclusion or restriction during administrative proceedings before the Patent and Trademark Office" for the prosecution history to demonstrate an applicant's intention to deviate from the ordinary and accustomed meaning of the claim terms. Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1326 (Fed. Cir. 2002); see also Rambus, Inc. v. Infineon Techs. AG, 318 F.3d 1081, 1095 (Fed. Cir. 2003). In addition, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiations, it often

lacks the clarity of the specification and thus is far less useful for claim construction purposes."
Phillips, 415 F.3d at 1317.

**III.    CONSTRUCTION OF CLAIM TERMS IN CLAIM 1 OF THE '737 PATENT**

In claim 1 of the '737 patent, a user operating a browsing device has requested a web page. In practical terms, the method of serving the requested web page back to the user encompasses (1) identifying the user; (2) looking up stored information about the user's preferences for content and/or formatting; (3) receiving format identifiers from the user's request, or from storage, identifying the user's preferred type of formatting; and (4) generating a customized web page in the form of viewable data. Ablaise's proposed constructions provide a logical and correct reading of the claim to accomplish these objectives.[2]

**A.    "Displayed at a browsing device"**

Dow does not seek construction of the term "browsing device," but only of the word "displayed." This term does not require construction. "Displayed at a browsing device" is commonly understood language and has a plain meaning even to lay persons. It means displayed at a browsing device.

More importantly, "displayed at a browsing device" is part of a larger phrase that describes "formatting data" served by the server, not a step of displaying the data. In other words, it is not necessary for Dow to "display at a browsing device" in order to infringe the claim. The steps of the claim take place entirely on the server side. The preamble of claim only places limitations on the type of viewable data that is served to a browser.

The server-centric nature of the claim is apparent from the language of the claim as a whole. Claim 1 recites

---

[2] For the Court's convenience, a chart of the disputed terms and the claim constructions proposed by Dow and Ablaise is provided as Exhibit A to the declaration of Trevor Foster.

> A method of serving pages of viewable data to browsing devices connected to a network, wherein a page of said viewable data comprises content data defining text and/or graphics and formatting data which specifies locations of said text and/or graphics within a page, and said viewable data is displayed at a browsing device such that locations of said text and/or graphics depend on said formatting data, said method comprising:

Rosenbloom Decl. Exh. A at Col. 19, l. 65 – Col. 20, l. 5 (emphasis added). The language before the word "wherein" sets forth the scope of the claim. It is a method of serving pages of viewable data to browsing devices. It is not a method of displaying viewable data at a browsing device. The language after the word "wherein" describes the viewable data that is served, explaining that the viewable data is made up of content data and of formatting data that specifies locations for the content data. The word "location" describes how the content data will look when displayed at a browsing device. It is simply a description of the type of viewable data served by the method of this claim.

The remaining claim language further supports this understanding of the claim. All of the recited steps in the "method for serving pages of viewable data" are performed on the server side, not the browser side. The first step is "identifying requests from browsing devices" and the last step is to "generate viewable data" which is served to a browsing device. There is no step relating to how a browser renders the viewable data or what hardware is used to display the data. That is not part of a "method for serving pages."

The specification confirms that the browser itself, or the method of display, is not important, and not a part of the invention of a method for serving pages. The entire specification describes serving signals to browsing devices. For instance, the Title is "Serving Signals." The Abstract begins "[o]utput signals are served from a service device to a plurality of browsing devices." The Field of the Invention states, "[t]he present invention relates to serving signals to

browsing clients." Rosenbloom Decl. Exh. A at Col. 1, ll. 12-13. It is readily apparent to one of skill in the art reading the specification that the invention relates entirely to what is done on the server side to deliver a customized web page. (Hicks Aff. ¶ 21.)

Furthermore, the phrase "displayed at a browsing device" in the preamble does not limit the scope of the invention. Rather, the fact that the served pages may be displayed at a browsing device merely states a purpose or intended use for the invention, which means that the preamble phrase is not a limitation of the claim. Catalina Mktg. Int'l v. Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed. Cir. 2002) . Finally, if the claim language is to be construed regardless of the fact that it is not limiting, Dow's construction is incorrect. Dow seeks to add limitations to the claim with its construction "visually represented *on the screen of* a browsing device." The language "visually represented" is nothing more than the common meaning of "displayed." Dow then adds "on the screen" of a browsing device. A browsing device is usually associated with something that permits display, such as a computer monitor, projector or other form of display. The claim language is "displayed <u>at</u> a browsing device," not <u>on the screen of</u> a browsing device. The specification confirms that "a browser is an application capable of interpreting and displaying documents received in HTML in such a way that the information is displayed to the user in a form compatible with the user's available equipment." Rosenbloom Decl. Exh. A at Col. 3, ll. 20-24. Dow's attempt to limit the claim to one type of "available equipment" should be rejected.[3]

---

[3] Also worth noting is that viewable data may be displayed. Obviously that does not mean that the formatting data can itself can be seen. As the claim itself states, the formatting data "specifies locations of said text and/graphics data." What a user sees is the content data in a specified location.

B.    **"Storing executable functions"**

There is no dispute that "**storing executable functions**" means "**storing at least two executable functions.**" The term **"function,"** however, has a plain and ordinary meaning to someone of ordinary skill in the art at the time of the invention which is **"an identifiable unit of computer instructions."** The specification supports the ordinary meaning. No other limitations should be read into this phrase because no other limitations are part of the ordinary meaning, and there is no clear and unmistakable statement elsewhere in the intrinsic record that would limit the term.

The specification clearly and repeatedly explains any identifiable unit of instructions constitutes a function. For instance, the specification states "a format function of this type may be considered as the smallest unit of instructions for producing a portion of HTML code." Id. at Col. 12, ll. 46-48 (emphasis added). These functions must be identified by the computer program. See, e.g., Id. at Col. 13 l. 42-44 (identifying functions by "index reference"). Functions also have broad applications within computer programs. For example, the specification discloses functions which write HTML, see, e.g., Id. at Col. 12 l. 46-48 or read from the database or content store, see, e.g., Id. at Col. 15, ll. 54-58. Moreover, a person of ordinary skill in the art would understand that a computer program can typically identify functions by such things as a name, memory address, index or other mechanism depending upon the circumstances. (Hicks Aff. ¶ 22.)

Dow attempts to add limitations to an otherwise simple definition without any support from the claim language itself. In fact, Dow defines the claim language *with* the claim language only to then add additional unsupported limitations. Dow defines "storing executable functions" as "storing a universal set of all available functions, where each function has a name and consists of a set of function steps (i.e., instructions), each of which, when executed, creates a portion of

code (e.g., HTML code)." (Dow Br. 19). In doing so, Dow is asking this court to write in three limitations that: (1) storing requires the storing of a universal set of all available functions, (2) functions need to be named, and (3) functions must include multiple function steps, and write HTML code. These limitations are not supported by either the intrinsic or extrinsic evidence and should be rejected.

### 1. Storing does not mean storing a universal set of all available functions.

Dow improperly imports from the description of the preferred embodiment that "the system as a whole includes a universal family set of all the available functions." Rosenbloom Decl. Exh. A at Col. 12, ll. 49-52. It is perfectly reasonable to interpret this statement to mean simply that the system may store a set of functions that is larger than the set the system uses in a given context. The statement does not say the system must store every known function. In any event, this description of the preferred embodiment should not be read into the claim. Teleflex, Inc., 299 F.3d at 1326. Nor did the inventors indicate that this was an "essential feature" as Dow asserts. (Dow Br. 20). There is simply no support for Dow's contention.

Moreover, there is intrinsic evidence that a system would not necessarily include every possible function. The specification explains: "[a]s the system develops, new functions may be added to the family set and it is expected that the HTML standard will be enhanced, thereby requiring additional functions to be created." Rosenbloom Decl. Exh. A at Col. 12, ll. 52-54. The inventors therefore acknowledged that the "universal family set of all available functions" did not, in fact, contain every possible function to generate viewable data. The Court should not import a limitation from the specification, particularly where the specification makes it clear that the "family set" of functions stored in the system can receive additions over time. Id.

### 2.    Functions need not be named, merely identified.

One way a function can be identified is a name, but the claim language does not limit itself to identification of functions only by name. The specification discusses functions being identifiable, with no mention of named functions. Nevertheless, Dow asserts that "the specification implies that each particular function within the universal set is associated with a unique identifier [e.g., each function has a name] because a list, by definition, is a series of names." (Dow Br. 22.) Dow provides no justification for why an identifiable function need be identified by only a name. The specification teaches differently. For example, in one embodiment functions are referenced not by name, but, instead "a function string *index* is identified . . . and at step 1204 the indexed function string is read from the string list store 1103." An index could be, for example, an internal memory address by the computer. (Hicks Aff. ¶ 22.) What matters is not the precise mode of identification, [e.g., a name] but that the function can be identified by the system. In fact, a portion of the specification relied upon by Dow describes a formatting function as "the smallest unit of instructions for producing a portion of HTML code." Rosenbloom Decl. Exh. A at Col. 12, ll. 46-48. See also (Dow Br. 20). This definition lacks any reference to the formatting functions having a name.

Given the lack of support for its definition in the intrinsic record, Dow improperly relies on a series of extrinsic dictionary definitions to support its limitation. See, e.g., Phillips, 415 F.3d at 1322, Ferguson Beauregard/Logic v. Mega Systems, 350 F.3d 1327, 1338 (Fed. Cir. 2003). However, Dow's own cited dictionaries from the time of the invention do not require functions to be named, only that they be callable by the program.[4] Dow then invites legal error

---

[4] For example, in the only two definitions that reflect the meaning of "function" at the time of the invention, Dow fails to demonstrate why functions necessitate a "name." Microsoft's dictionary defines a function merely as "the purpose of or the action carried out by a program or routine, a general term for a subroutine, in some languages a subroutine that returns a single value." Computer Dictionary, Microsoft Press, 179 (2d ed. 1994). Because the

by relying on several recent internet dictionaries for the proposition that "a list, by definition, is a series of names." (Dow Br. 22, n.10). Dow provides no analysis explaining why there could not be a list of anything beyond names, particularly in light of the specification's disclosure of lists of functions, Rosenbloom Decl. Exh. A at Col. 13, l. 44), strings, Id. at l. 48, ASCII text, Id. at Col. 3. l. 65, or indexes, Rosenbloom Decl. Exh. A at Col. 13, l. 20. Dow's artificial limitation to named functions should be rejected.

### 3.     A function need not when executed, create a portion of code.

Dow asserts that each function consists of "one or more function steps (i.e. instructions), which, when executed, create a portion of a web page." (Dow Br. 20). It is true that, "formatting functions . . . generate small portions of HTML code," Rosenbloom Decl. Exh. A at Col. 13, l. 3 (emphasis added), and that function steps "may be considered as the smallest portion of a function that results in a write to the HTML buffer." Id. at Col. 18, ll. 49-51 (emphasis added); see also (Dow Br. 21). However, Dow's assertion that all functions must create a portion of HTML code is incorrect. For instance, some functions may simply retrieve data. The specification teaches that, "[e]xecution of a function read from the string list may result in HTML tags being written directly to the output HTML buffer 1102. Alternatively, execution of these functions may result in a call being made to the text database 1104 or to the graphics database. Rosenbloom Decl. Ex. A at Col. 15, ll. 54-58 (emphasis added). Thus, Dow's definition is directly contrary to the specification and is too limiting.

---

definition of function does not include a name, Dow instead relies on "procedure," a term only found within the definition's "see also" section. Br. at 22 n.11 This is a blatant mischaracterization of the definition, particularly in light of the definition failing to even include the word "procedure." Dow's citation to the IBM Dictionary of Computer is also suspect. Instead of relying on the dictionary's broad definition of "function" as a "subroutine that returns the value of a single variable and that usually has a single exit" they rely upon a subsequent definition specific to the C and Fortran programming languages—a limitation that is not supported by the claim language or the specification. IBM Dictionary of Computing, 1994.

# Exhibit D
# Part 2

**C.**    **"In response to identifying a request for specified content data and a user identifier; (a)...(e)..."**

This portion of the claim language has a plain and ordinary meaning and does not require construction by the Court. It means what it says. Specifically, after a request for specified content data and a user identifier are identified, perform steps (a) through (e) of the claimed method. In practical terms, the claim is simply saying that once the web server knows that a particular user has requested a web page, the steps of generating the page should be performed. A jury can certainly understand that without further explanation by the Court.

Dow agrees with the obvious meaning of this claim language. Its proposed construction begins, "performing steps (a) through (e) in response to identifying a request for specified content data and a user identifier." This definition merely restates the claim language and reinforces the notion that it does not require construction. Dow's proposal then continues with, "wherein the request was transmitted by a browsing device." This is essentially true, but at this point Dow is no longer construing the claim language for which it is proposing a definition. Other claim language calls for "identifying requests from browsing devices." Rosenbloom Decl. Exh. A at Col. 20 l. 6.

Dow's departure from the claim language in question leads it to its most brazen attempt to simply add claim limitations that it feels will provide a non-infringement argument. Dow next proposes that the request "includes a format identifier that is separate and distinct from a user identifier." Dow makes no attempt to tie its proposed construction to any claim term. It simply adds a format identifier to the request and then adds that it is separate and distinct from a user identifier. The claim in question makes no reference to a "format identifier." The Court should reject this approach and address the term "format identifier," as Ablaise does, where it appears in a separate part of the claim.

**D.    "Receiving format identifiers identifying the type of formatting required"**

This phrase can be broken up into three parts.  First, "receiving" is a commonly understood word that does not require construction.  However, because of Dow's arguments Ablaise will explain that the language "receiving format identifiers" does not state any origin or means of delivery for the format identifiers -- just that they are received.  Second, a "**format identifier**" in this claim is "**an identifier corresponding to a type of formatting specified by a user from at least two types of formatting available to the user for specified content data.**" Third, the plain meaning of "**type of formatting**" is simply "**a layout or presentation of text and/or graphics on a page.**"  Other language in this claim limits the layout or presentation to "locations" on the page.

The practical effect of these constructions can be understood with reference to the disclosed preferred embodiment.  What really happens is that a user is presented with a web page and then makes a selection for where certain content should appear on the web page.  In many cases the server immediately returns the page in the user specified format.  The server may also remember the user and the type of formatting specified by the user by storing the format identifier.  Then, the next time that particular user asks for that web page, the server will identify the user, receive a format identifier corresponding to the type of formatting specified by that user from the storage location, and serve a web page with text and/or graphics located where the user wants.  The support for Ablaise's construction of "receiving," "format identifier," and "type of formatting" are provided below.

**1.    "*Receiving* format identifiers"**

As stated above, this term does not require construction.  Dow has not offered a construction for "receiving" and merely repeated the word "receiving" in its proposed construction. (Dow Br. 13.)  However, Dow asks the Court to find that "the format identifiers are

included in said identified request for specified content data." In other words, the format identifiers must be included with the URL calling for a web page and cannot be looked up in memory or a database. The claim language and specification prove this construction wrong, and the file history does not narrow the plain meaning of the claim language.

> **a.    The claim language is unambiguous, and not limited to receiving the format identifiers in the request.**

Initially, the word "receiving" means "receiving." It doesn't mean receiving from a particular location or in a particular way. The claim does not recite where the format identifiers were. It only requires that they be received. Claim construction is about defining terms in the claim. SRI Int'l, Inc., 775 F.2d at 1121. Dow is simply not defining any term here. It is just adding words to the claim. To rule on this issue, the Court need look no further, but additional reasons will be provided.

In the context provided by the rest of claim 1 it seems more likely that the format identifiers do not come in the request. Claim construction requires interpretation of the entire claim in context, not a single element in isolation. ACTV, Inc. v. Walt Disney Co., 346 F.3d 1082, 1090 (Fed. Cir. 2003). "Receiving format identifiers" is step (c) of five steps that happen "in response to identifying a request ....and a user identifier." Thus format identifiers are received "in response to" a request, not necessarily "in" the request. If the inventors had intended to limit the claim as Dow suggests, they would have claimed "in response to identifying a request including a format identifier," performing the following steps. That would be a different claim.

Finally, dependent claim 2 indicates that claim 1 is not limited to receiving a format identifier with the request. Dependent clam 2 introduces a new limitation to claim 1 that the format identifier needs to be received in the URL. The Federal Circuit has recognized through

the doctrine of claim differentiation that, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." Kim v. ConAgra Foods, Inc., 465 F.3d 1312, 1319 (Fed. Cir. 2006) (quoting Phillips, 415 F.3d at 1315)). In this case, claim 2 adds the particular limitation that "said format identifier is received with said request for specified content data, whereby viewable data is served to a browser for display with a format that depends upon the particular format identifier received from said browser." Rosenbloom Decl. Exh. A at Col. 20, ll. 27-31. Thus, a presumption exists that the claim does not require that format identifiers are received with the request from the browser. The format identifiers can come from somewhere else.

### b. The specification includes at least two embodiments to support the plain meaning of the claims.

Dow commits two errors in seeking to import the limitation of "receiving format identifiers from a browser" from the specification into the claims. First, it is error to import a preferred embodiment into the claims contrary to the plain language of the claims. "Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004). The preferred embodiment in the specification clearly discloses receiving format identifiers with a request from a browser as recited in claim 2. See, e.g., Rosenbloom Decl. Exh. A at Col. 14, ll. 3-7. However, there is no word in claim 1 that can be defined to include this limitation.

Secondly, Dow commits error by seeking a construction that contradicts the specification. The specification discloses another embodiment in which the format identifier is received from a storage location and not from the browser. Specifically, the specification teaches that the server

and associated software may look up information in a "user database" and use that information to change which HTML formatting tags it writes into a dynamically generated page. Rosenbloom Decl. Exh. A at Col. 15, ll. 6 - Col. 16 ll. 14. In this embodiment, the format identifier is received from the user database, rather than from the URL sent by the browser.

This embodiment is found in a part of the specification that describes how data is processed in the preferred embodiment to generate pages on-the-fly that include formatting data ("HTML data" known as tags), text data, and graphics data. See e.g. Rosenbloom Decl. Exh. A at Col. 15, ll. 6-34. In this embodiment, the computer uses one or more "functions" to write HTML format tags. The functions may be put together as a string of functions that have a particular index that identifies that string of functions. The computer uses "indexes" to find the functions it needs, for example to write a particular format tag. This embodiment describes using information in the user database to change which index the computer uses to find one or more formatting functions. This part of the description concludes, "Thus, it is possible to adjust the relationship between indexes and strings, *thereby adjusting the way in which the data is actually formatted in response to a particular request*." Id. at Col. 15, ll. 31-34. How this adjustment occurs is further described:

> [i]n addition to use [sic] the user database to confirm user validity and to record actions made by the user (possibly for billing purposes) the on-line processor 301 may also make use of information read from the user database in order to adjust the relationship between indexes (1106, 1109, 1110) and their associated function strings and data (1107, 1108, 1111).

Rosenbloom Decl. Exh. A at Col. 16, ll. 8-14 (emphasis added). Parsing the quote, the information read from the user database may be used to adjust the relationship between index 1106 and associated function strings 1107. See Fig. 11. Moreover, "[e]xecution of a function read from the string list may result in HTML tags being written directly to the output HTML

buffer." Id. at Col. 15 ll. 54-56. If a different function is called, a different HTML tag may be written. Thus, information read from the user database may include a user format preference which corresponds to certain HTML tags being written, "thereby adjusting the way in which the data is actually formatted in response to a request." In other words, format identifiers may be stored and later read from the user database. This explains why the inventors claimed broadly "receiving format identifiers." They could be received from more than one place, for instance, from a database or with a request. The claim should not be limited to exclude this alternative embodiment in which the format identifier need not be received with the request from the browser, and instead can be received from a storage.

c.     **The file history does not alter the plain meaning of the claims.**

The statements in the file history cited by Dow do not show a clear disavowal of claim scope. The Federal Circuit explained in Teleflex that,

> "claim terms take on their ordinary and accustomed meanings unless the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using <u>words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope</u>."

Teleflex, Inc. v. Ficosa North America Corp., 299 F.3d 1313, 1324 (Fed. Cir. 2002) (emphasis added). In addition, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of those negotiations, it often lacks the clarity of the specification and thus is far less useful for claim construction purposes." Phillips, 415 F.3d at 1317.

Dow points to statements made to distinguish U.S. Pat. No. 5,848,413 issued to Wolff ("Wolff") (Foster Decl. Ex. B). Wolff is directed to a system and method for accessing and publishing electronic documents. When the Examiner asserted that Wolff met the limitation of

"receiving format identifiers," the Examiner pointed to several passages within Wolff that all included a discussion of a URL that acted as a locator/identifier of documents. (See Foster Aff. Ex. C, Office Action, dated 9/17/2003, at 4 (citing, by the examiner, Wolff at Col. 5, ll. 47-67, Col. 6, ll. 30-57 and Col. 7, ll. 6-61, Col. 9, ll. 28-67.) Therefore, the examiner took the position that Wolff taught receiving format identifiers by receiving locators/identifiers in a URL request, i.e., a request from a client to a server.

In response, the inventors argued that the examiner misunderstood the meaning of "format" in the claims. The word "format" in the Wolff patent referred to data transmission protocol, not graphical format – the layout of content on a page. Thus, in Wolff, the same document was sent in different ways, such as by fax or by HTTP, rather than two different documents being sent with different "format" for the same content on the page. As argued by the inventors, in the Wolff patent "the requested documents is [sic] sent in different file signal transmission formats (using http protocol or G3 protocol), there is no suggestion that the layout of the page content being transmitted is different in either case." Rosenbloom Decl. Ex. M, Amendment, dated Dec. 16, 2003, at 15. The inventors were trying to make this distinction about "format" with the following statements relied on by Dow:

> Applicant has described and claimed an arrangement whereby two different clients requesting the same content data from the same server may receive differently formatted versions of that same content data depending upon a particular format identifier received from each respective client at the server.
>
> *        *        *        *
>
> As will be explained in more detail below, it is not believed that the cited Wolff reference in any way teaches serving the same text/graphic content in different viewable page formats- depending upon received requests incorporating respectively different format identifiers.

Id. at 13. A close examination of these statements reveals no disavowal of claim scope.

First, these statements are not addressing the question of where the format identifiers are received from, or even the claim language "receiving format identifiers" that the Court is being asked to interpret. The issue at hand was whether two different data transmission protocols are the same as two different "formats" or page layouts. Hypothetically speaking, this is not a situation where the Examiner cited prior art in which format identifiers were received from a database, and the inventors stated that their format identifiers come with the request.

Second, because the Wolff patent dealt only with transmission of requested documents, and not looking up anything in a database, it makes sense the inventors would make, an apples to apples comparison with the embodiment of their invention where the format identifiers do come with the request.

Third, the first statement cited by Dow is expressly open ended. It states that "a particular format identifier received from each respective client at the server," but does not expressly state that format identifier was included with the request for content data. Even though the second statement places the format identifier in the request for content data, the statements read together cannot be considered a clear disavowal of claim scope.

Fourth, at the time the inventors made these remarks, dependent claim 3 recited that "said format identifiers are received from browsing devices with said requests for specified content data." Id. at 3. Dependent claim 16 was nearly identical. Id. at 9. These claims, just like issued claim 2, demonstrate that the independent claims were not limited to receiving the format identifiers with the request. It could not have been the inventor's intention, or the Examiner's understanding, that independent claims 2 and 15 were limited to the scope of dependent claims 3 and 16. Had the Examiner interpreted the statements as Dow urges, he would have required the limitation of claim 3 to be added to claim 2 to limit it to receiving format identifiers with the

DC1 45695325 1                                   -28-

request. He did not because that did not reflect the context or the meaning of the statements. Read in this context, it is clear that no disavowal of claim scope occurred.

Finally, statements Dow raises from the '530 file history are inapposite. The claims of the '530 patent are limited to receiving formatting information in the request. Claim 1 of the '530 patent states, "identifying requests from browsing devices that define a request for specified viewable data, said request including formatting type identification data." Rosenbloom Decl. Exh. A at Col. 19. ll. 61-62. (emphasis added). It is wholly unremarkable that in discussing those claims the inventors would state that "the present invention receives data from a browser which indicates the type of formatting required by the browser." Rosenbloom Decl Ex.O, Amendment dated April 13, 2000, at 6. In fact, the express limitation in the claims of the '530 patent to receiving formatting type identification data in the request, and the absence of such a limitation in the '737 patent, demonstrates that the inventors knew how to claim it both ways. They intentionally choose not to limit the '737 patent to receiving format identifiers in the request for content data.

2.    "format identifiers"

A "format identifier" in this claim is "an identifier corresponding to a type of formatting specified by a user from at least two types of formatting available to the user for specified content data."

The claim language is nearly self defining. It expressly recites that a format identifier must identify the type of formatting required. '737 Patent, Claim 1. The parties seem to agree on this point.[5] However, Ablaise's definition correctly points out that in order to identify a particular type of formatting, there must be at least two available types of formatting. Obviously,

---

[5]  For instance, Dow states that the "specification teaches that the term 'format identifier' simply means 'an identifier for the [type of] formatting requested [i.e., required]." In this case, the requester is the user who requires a certain type of formatting.

a key purpose for the invention claimed in the '737 is to allow a user to choose between at least two available types of formatting, and there is no need for an identifier if there is only one option.

The well known term "identifier" does not require further construction. The patent specification at one point uses the alternate term "element" stating, "an element identifying the type of formatting required." Rosenbloom Decl. Exh. A at Col. 14, ll. 4-5. The dictionary definitions cited by Dow include a "name," "token" and a "string of characters." Dow leaves out a further definition from one of its sources which is "a sequence of bits *or* characters that identifies a program, device or system to another program, device or system." IBM Dictionary of Computing p. 323 (1994). There is no reason to single out "a sequence of one or more characters" as Dow has. An "identifier" to one of ordinary skill in the art can include all of these examples depending on how they are used. (Hicks Aff. ¶ 24.) Specifically, "the defining characteristic of an identifier is that it identifies something." (Id.) Finally, Ablaise's definition indicates that a format identifier corresponds to a type of formatting specified by a user for specified content data. The claim itself indicates that the step of "receiving format identifiers identifying the type of formatting required is done "in response to identifying ... a user identifier." Rosenbloom Decl. Exh. A at Col. 20, ll. 12-13. Moreover, the specification describes that users indicate preferences such as which type of formatting they prefer. For instance, one claimed mode of operation made it "possible for the user to <u>identify</u> information to the system as a means of expressing user preferences. . . . Thus, it is possible for the user to specify preferences such that the system becomes more tailor-made and specific to that particular user." Id. at Col. 16 ll. 39-41, 61-63 (emphasis added). These excerpts illustrate that the term "format identifier" in the '737 patent identifies specified user preferences.

The file history further confirms the role of the format identifier as follows:

> Applicant has described and claimed an arrangement whereby two different clients requesting the same content data from the same server may receive differently formatted versions of that same content data depending upon a particular format identifier received from each respective client at the server.

Amendment filed Dec. 16, 2003 at 13. This statement indicates the intention for the claims to cover a method where the format identifier comes from the client and indicates the format requested by the client for particular content.[6] Thus, a format identifier is "an identifier corresponding to a type of formatting specified by a user from at least two types of formatting available to the user for specified content data."

### 3.    "type of formatting"

The plain meaning of a **"type of formatting"** is **"a layout or presentation of text and/or graphics on a page."** It is undisputed that formatting in the '737 patent means page layout. As described above, the claims, specification and file history demonstrate that a user chooses a type of formatting and that choice is supplied to the server in the form of a format identifier. The format identifier is then used by the server to return a page displaying the chosen type of formatting, or it is stored for use the next time that user requests content. Moreover, just as a user identifier identifies a user, a format identifier identifies a user's chosen type of formatting. In other words, a "type of formatting" in the '737 patent is simply how a user wants the page to look. (Hicks Aff. ¶ 25.) As will be seen in the next section, the server then selects functions based upon what content that user wants, and how the user wants the page to look.

Dow urges a radically different definition of "type of formatting." Dow's definition, "indexed function string," represents a fundamental misunderstanding of the claim. Dow's

---

[6] (See Part III.D.1.A supra. for the proposition that the format identifier need not be included with the particular request for content).

mistake may stem from the fact that a format identifier can identify more than one thing. The claim requires that it identify the type of formatting required by the user. It can also identify to the server what the server must do to generate that type of formatting. In the claim, the program running on the server selects one or more functions in dependence upon a format identifier. This does not mean that the "type of formatting" is the "set of functions" selected. SRI Int'l, Inc. v. Matsushita Elec. Corp., 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc).

Dow is correct that in the preferred embodiment, a format identifier is also used to select indexed function strings. That does not change the fact that a format identifier also identifies the "formatting requested" by the client. Rosenbloom Decl. Exh. A at Col. 14, ll. 37-38. Clearly, a user does not request an indexed function string. A user requests a type of formatting, that is, "a layout or presentation of text and/or graphics on a page."

**E.    "Selecting a set of stored functions in dependence upon a received format identifier and said read user information."**

The phrase "selecting a set of stored functions in dependence upon a received format identifier and said read user information" has a plain and ordinary meaning of "selecting one or more functions based upon a received format identifier and said read user information."

As already described above, a "function" is an "identifiable unit of computer instructions." A "set" has a plain and ordinary meaning to one skilled in the art. It simply means one or more of an entity, in this case, the stored functions.[7] The remaining word in this claim limitation, "selecting" has a plain and ordinary meaning to one skilled in the art. It means "selecting" and therefore does not need to be construed. (Hicks Aff. ¶ 26.) It is important to understand that this Court need not construe each and every element of every asserted claim, nor must it construe a

---

[7] See, e.g., IBM Dictionary of Computing, 1994 (a set is a "finite or infinite number of objects of any kind, of entities, or of concepts that have a given property or properties in common"); Microsoft Computing Dictionary, 1994 (a set is a "group of objects, usually having one or more characteristics (properties) in common")

disputed claim element merely because a party raises it during the *Markman* proceedings. In this case, there is no better or more explanatory term than the one in the claim: selecting. Any attempt to change the word is likely to be either redundant or a change in the meaning of the claim without justification. See N. Telecom Ltd. v. Samsung Elects. Co., 215 F.3d 1281, 1288 (Fed. Cir. 2000) ("The use of extrinsic evidence to construe the scope of a claim is improper where the ordinary and accustomed meaning of a claim term does not render the scope of the claim unclear and where the patentee has not chosen to be his own lexicographer.")

The specification provides support for the plain and ordinary meaning of selecting. For instance, one example in the specification is that the term "selecting," when used in reference to functions, can mean "calling" those functions. The relevant portion of the specification states, "when a particular call is made for formatting signals, in the form of an executable string of functions, the particular call identifies the index reference within the list of strings, resulting in the selected index being selected from the list and thereafter executed in combination with the referenced data." Rosenbloom Decl. Exh. A at Col. 13 ll. 53-56. It is clear from this portion of the specification that "a particular call" results in a function being "selected . . . and thereafter executed in combination with the referenced data." Id. (emphasis added). In this portion of the embodiment, the call is the selection. This explanation is consistent with the common practice of computer programming. When a software program needs to "execute" a function, the computer program must first invoke that function—often with "data" such as a variable—so that the system can transfer control of the program to that function or subroutine. This process is referred to as calling a function and is the process of how a computer program programmatically selects a particular function. (Hicks Aff. ¶ 27.) The selection of one or more functions are based upon a received format identifier and said read user information, meaning, that at least one

function in the set must be selected based in whole or in part on the read user information and at least one function within the set must be selected based in whole or in part on a format identifier.[8]

Dow asks the Court to rewrite the claim language in question to read, "choosing a particular stored and indexed function string from a set of stored and indexed function strings, wherein the selection is dependent on both a received format identifier and said read user information, which are separate and distinct, and the format identifier is included in said identified request for specified content."  Dow's construction ignores the specification when explaining specific claim terms, but inserts details of the preferred embodiment into the claim that are inconsistent with the claim language itself.  Dow argues incorrectly to: (1) define selecting as "choosing"; (2) limit "a set of stored functions" to an "indexed function string from a set of stored and indexed function strings"; and (3) require that the "format identifier is included in said identified request for specified content."

> **1.    "Choosing" is not the plain and ordinary meaning of "Selecting" in the context of selecting computer functions.**

Dow relies on a modern general purpose dictionary, the 2004 American Heritage Dictionary, to define the term "selecting." Dow provides no justification why this definition helps this Court better understand selecting within the context of the art.  Extrinsic evidence should only be relied on when the specification lacks guidance, and should not be used to contradict the specification.  <u>Phillips</u>, 415 F.3d at 1321.  Here, the meaning is clear to one of ordinary skill in the art, and the specification provides further guidance.  For example, the specification explains that one way to select a function is by "calling a function."  The relevant

---

[8] Although Ablaise does not contest that "read user information" is distinct from "format identifiers" it does contest Dow's mischaracterization of statements made by Ablaise's counsel during the course of unrelated licensing discussions where it arbitrary inserts "[i.e., user preference information]" to characterize components of the prior art as incorporating user preference information.

question is what someone of ordinary skill in the relevant art would have understood the term to mean *at the time of the invention*. Phillips, 414 F.3d at 1313. It is not what a general purpose dictionary says 9 years later. Dow's construction is therefore both unnecessary and incorrect.

### 2.    A "set of functions" is not limited to an "indexed function string from a set of stored and indexed function strings."

Dow takes a simple term to those with ordinary skill in the art, "set" and attempts to limit it to a particular kind of set disclosed in the preferred embodiment, "an indexed function string."[9] Dow further attempts to *limit its limitation* by arguing a "function string" must be from a "set of indexed function strings." Dow attempts this limitation even though the claims never recite the term "function string." The claim recites "selecting a set of functions" not "selecting a set of function strings."

Moreover, the specification describes functions, as independent entities, as distinct from "function strings" which are identified only in the preferred embodiment. As Dow aptly points out, the specification also explicitly references a "set of functions." Rosenbloom Decl. Exh. A at Col. 16 l. 4. Dow's assertion that a set of functions can only be a function string and that those function strings must be stored in a set of function strings is therefore incorrect.

The specification, and Dow's own previous arguments, acknowledge that a "set of functions" is not limited to just "indexed function strings" but can instead take multiple forms. First, Dow acknowledges that a "set" in the context of functions could simply be one or more of a related entity. In defining "storing executable functions," Dow states that each function "consists of a set of function steps," (Dow Br. 19) (emphasis added), a phrase they later articulate as requiring that each function "consists of one or more function steps (*i.e.*,

---

[9] Notably, Dow earlier argues that a "type of formatting" is "an indexed function string." Here, Dow argues that a "set of functions" is "an indexed function string." Dow's arguments have no basis in fact or law. Dow simply wishes to add "indexed function string" to the claims in order to manufacture another limitation to the claimed invention.

instructions)." Id. (emphasis added). Second, an embodiment within the specification also

describes a string of functions, or "function strings" which also may be considered a "set of

functions" since they include one or more functions. See, e.g., Rosenbloom Decl. Exh. A at Col.

13 ll. 9-15. Third, the portion of the preferred embodiment Dow relies upon actually discusses

executing an "identified set of functions" read from "particular function strings." Id. at Col. 15

ll. 63-67 –Col. 16. ll. 1-7; see also (Dow Br. 38). Therefore, a "set of functions" could also

consist of one or more functions read from multiple "function strings." Finally, the preferred

embodiment identifies a "universal family set of all the available functions." Rosenbloom Decl.

Exh. A at Col. 12 ll. 49-51. Here, the specification uses "set" generically to refer to all of the

computer program's functions. In most of these examples, the "set of functions" are independent

and unrelated to "function strings." It is clear, therefore, that the plain and ordinary meaning of a

"set of functions" merely refers to "one or more functions" which by consequence can take

different forms. There is no basis for Dow's attempt to limit a "set of functions" to only one

such form discussed in the preferred embodiment. Dow's tortured construction is both

unnecessary and unsupported. There is no reason to alter the plain and ordinary meaning of a set

of functions, which is "one or more functions."

  **3. The claim language does not state that the "format identifier is
included in said identified request for specified content data."**

  For the third time, Dow adds the limitation that the format identifier must be included in

the request. This claim language is talking about selecting functions. It has nothing to do with

the origin of the format identifier.

  **F. "Executing said set of functions to generate viewable data comprising said
selected content data and formatting data"**

  The only term in this phrase that may require construction is **"formatting data."** The

plain and ordinary meaning is, **"markup language, such as HTML tags."** The rest of the

DC1 45695325.1                                 -36-

phrase is simply the logical final step of serving a page. The functions are executed to generate viewable data comprising content data and formatting data.

Dow chooses this portion of the claim to argue that "formatting data" is limited to "locations" for text and graphics. It is undisputed that "formatting data" in the specification is mark-up language such as HTML tags that a browser can interpret to alter the layout or presentation of text or graphics. Moreover, HTML tags can control location, font, color, bold etc. However, for this claim, the inventors chose to limit the claim to particular formatting data "which specifies locations of said text and/or graphics with a page." Rosenbloom Decl. Exh. A at Col. 20, ll. 1-2. This limitation came in an amendment to the preamble. Rosenbloom Decl. Ex. M, Amendment, dated Dec. 16, 2003, at 1-12, 16. Thus while Dow's definition is not in accordance with the plain and ordinary meaning of "formatting data" as used in step (e), it is correct to say the claim in general is limited to certain formatting data which specifies location. No further construction of this phrase is required.

## IV.     CONSTRUCTION OF CLAIM TERMS IN CLAIM 1 OF THE '530 PATENT

In claim 1 of the '530 patent, a browsing device has requested a web page with a specified page format. In practical terms, the method of serving the web page back to the browsing device encompasses (1) identifying the specified page format from information provided in the request, (2) selecting formatting data (HTML tags) needed to create the specified page format; and (3) generating a customized web page from at least two options for the format of a portion of the page. Ablaise's proposed constructions provide a logical and correct reading of the claim to accomplish these objectives.

A.    **"Identifying requests from browsing devices that define a request for specified viewable data, said request including formatting type identification data"**

While Dow identifies this entire phrase, only "formatting type identification data" requires construction. It means, "data corresponding to a specified page format chosen from at least two page formats available to the requesting browsing device for specified viewable data." The rest of the words in the phrase have a plain meaning and do not require further definition.

"Formatting type identification data" is clearly similar to "a format identifier identifying a type of formatting" in the '737 patent. In the '737 patent claim 1 a user chooses a type of formatting. The format identifier then identifies the type of formatting chosen, and is used by the server to select a set of functions to execute. In the '530 patent, there is "a specified page format." Rosenbloom Decl. Exh. B at Col. 19, l. 59. Formatting type identification data is then sent from the browser to the server corresponding to the specified page format. Id. at Col. 19, ll. 61-63. The server then selects formatting data, instead of functions, in response to the formatting type identification data. Id. at Col. 20, ll. 4-5. Finally, viewable data, a web page, is sent back to the browsing device in the specified page format. Id. at Col. 20 ll. 14-19. Thus, the claim language supports Ablaise's definition that the formatting type identification data corresponds to a specified page format.

The claim itself also makes clear that there at least two page formats to chose from. The "output signals" enable a browser to generate a "first page format" or a "second page format" depending upon which formatting data is selected. Id. at Col. 20, ll. 14-19.

Finally, "formatting type identification *data*" is a broader term than "format identifier." It can, for instance, include a user identifier if the user identifier is used to select between two or more page formats. Unlike, the '737 patent, there is no claimed "user identifier" in the '530 patent. Thus, there can be no argument that the two are separate and distinct based on the claim

-38-

language. If the server recognizes the "data" as corresponding to specified page format selected from two page formats available to the browsing device, then the data is "formatting type identification data."

The inventors also clearly stated in the file history that "formatting type identification data" is a broader term. They stated, "the present invention receives data from a browser which indicates the type of formatting required by the browser (i.e., it includes formatting type indication data, which is exemplified in the description as a format identifier." Rosenbloom Decl. Ex. O, Amendment filed April 13, 2000 (emphasis added). This statement makes clear that while a format identifier "exemplifies" formatting type identification data, it is not the only example of formatting type identification data. Another example could be a user identifier. In fact, when discussing the selection of formatting data the inventors previously stated, "[s]uch selection may be on the basis of user information provided from the browser (with or without the assistance of a user database in the server) but the invention is not so limited." Rosenbloom Decl. Ex. R, Amendment dated August 20, 1999, at 5. Thus, the Examiner clearly understood the selection of formatting data could be made in dependence upon user information.

Dow admits a difference between "format identifier" and "formatting identification type data" by proffering two constructions. However, Dow's broader definition of "formatting type identification data" is still incorrect. Dow insists that the "data" must identify "a certain file structure." The claim itself demonstrates that the "data" identifies a "specified page format" and is used to select a "type of formatting data" – such as an HTML tag. Dow's confusion stems from a mistaken view of what "type of formatting data" means. Ablaise, will construe this term below, in connection with where it actually appears in the claim.

**B.**    **"Maintaining a plurality of formatting types of data defining respectively corresponding predetermined formats for portions of said viewable data"**

This phrase does not require construction except for the term "formatting types of data." The plain meaning of "formatting types of data" in the context of the '530 patent is "sets of mark-up tags, such as HTML tags." Furthermore, Dow improperly adds a limitation that formatting types of data must be stored in table.

**1.    "Formatting types of data"**

The meaning of "formatting types of data" is clear from the context of the claim. A person of ordinary skill in the art would immediately understand that content data is combined with formatting data (i.e. HTML tags) to generate viewable data as claimed. Claim 1 adds that formatting type identification data is used to select one type of formatting data or another for a portion of the viewable data. Rosenbloom Decl. Exh. B at Col. 19, l. 64- Col. 20, l. 6. The word "type" is simply used to designate one set of tags (a set could be one tag) from another such that, depending on the selection of formatting data, a specified page format may be returned to the browser.

The specification further supports the plain meaning of types of formatting data, stating:

> An (HTML) file is essentially an ASCII document interspersed with tags for formatting text and displaying images. The tags graphically represent instructions which are acted upon by a receivers browser, configured to render text or graphics. The browser has full control of how the page is displayed, therefore it is possible to generate a wide range of page lay-outs from a modest set of (HTML) tags.

Id. at Col. 3, ll. 1-8. The specification further explains the basic process of serving a web page stating, "viewable information is then processed so as to combine it with HTML tags, to produce output signals for transmission to browsing clients." Id. at Col. 11, ll. 31-33. Thus the

specification is clear that formatting data means HTML tags and a type of formatting data is simply one set of tags instead of another.

Dow argues that "type of formatting data" means "file structure." Dow's definition will not help the Court or a jury because it begs the question, "what is a file structure?" The specification uses the term "file structure" in two contexts. First, the specification notes that "HTML files may be stored in file structures that are substantially similar to conventional data formats." Id. at Col. 3, ll. 38-39. In this context, file structure means a common directory structure for storing information – in this case an HTML file with content data and formatting data already combined. This is not part of the invention.

Another part of the specification, cited by Dow, describes the basic operation of a server. The processor on the server receives human viewable data from a database and file structures from a file structure source. Id. at Col. 8 ll. 29-32. Then the processor combines the human viewable data with file structure data to generate a web page. Id. at Col. 8, ll. 32-36 (emphasis added). In this context, a "file structure" is a broad term which includes an HTML template which can be selected for formatting a portion of a web page. File structure data appears to operate in the same fashion as formatting data – it defines the presentation or layout of human viewable data (text and/or graphics) on a page.

Thus, Dow's construction is imprecise and confusing. Claim 1 does not recite a "type of file structure data" as stated in the specification language cited by Dow. The claim recites "type of formatting data." There can be no dispute that formatting data is "mark-up language such as HTML tags." The claim simply indicates a selection between one type of formatting data or another.

### 2.   "Maintaining" does not require "maintaining in a table."

The claim recites "maintaining a plurality of formatting types of data..." The word maintaining does not require construction. It includes, but is not limited to storing. For instance, it could also include maintaining in the code. (Hicks Aff. ¶ 31.)

Dow's proposed construction, "storing, in a table, . . ." effectively admits that "maintaining" includes "storing." For some result oriented purpose, Dow adds, "in a table" without defining any claim term. Consequently, Dow's proposal is nothing more than an invitation to rewrite the claim to say, "maintaining, **in a table**, a plurality of formatting types of data..." That would be a different claim.

Dow attempts to support its importation of a limitation into the claim by citing to the preferred embodiment. Dow argues, "the only specific structure identified for maintaining formatting type data is the 'string list store 1103', which is a table within a relational database.' (Dow Br. 44.) Initially, this is a method claim comprising steps that must be performed, not an apparatus claim with a "specific structure." There is no basis to search in the specification for a "specific structure" with which to limit the claim. In addition, the word "table" is not used in the specification cited by Dow.

Furthermore, the "string list store 1103" in the preferred embodiment clearly stores functions, not "formatting types of data." See e.g., Rosenbloom Decl. Exh. B at Col. 15, ll. 54-64 ("formatting information for the URL will result in particular function strings being read from the string list store"). Functions may be used, for instance, to call for content from a database, read the content, call for certain formatting data, or to write formatting data and content data to be served as a web page. See Id. at Col. 18 ll. 3-55. The claim language in question only requires "maintaining a plurality of formatting types of data." Dow is not only trying to import

the preferred embodiment into the claims, it is pointing to an largely irrelevant portion of the preferred embodiment.

Finally, Dow's reference to the file history is misguided, and far short of a disavowal of claim scope. The inventors were arguing that a prior art patent to Meske did not allow the selection between two different types of formatting for text or graphics. Amendment dated August 29, 1999, p. 5. Passing reference to the string list store which stores functions in the preferred embodiment as "table 1103" is irrelevant. There is no indication that the inventors limited the plain meaning of the claim language "maintaining" to "storing, in a table." Maintaining means maintaining.

**C.** **"Selecting a specific one of said types of formatting data in response to said formatting type identification data"**

This phrase does not require construction. The phrase "types of formatting data" is the same as "formatting types of data" construed above and means "sets of mark-up tags, such as HTML tags." Dow only proposes that "selecting" means "choosing." This construction adds nothing and is unnecessary.

## CONCLUSION

For the foregoing reasons Ablaise respectfully requests that the Court reject Dow's attempt to limit the claims to the minutia of the preferred embodiment and to enter an Order in accordance with the constructions proposed by Ablaise.

DATED:  April 4, 2007

**ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

Jeffrey J. Downey (#427010)
T. Monique Jones
1875 Eye Street, NW, Suite 300
Washington, D.C. 20006-5409
Tel:  (202) 775-0725
Fax:  (202) 223-8604

Ron J. Schutz
Jake M. Holdreith
Cyrus A. Morton
Trevor J. Foster
Seth A. Northrop
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
Tel:  (612) 349-8500
Fax:  (612) 339-4181

Thomas G. Scavone
Niro, Scavone, Haller & Niro, Ltd.
181 West Madison Street, Suite 4600
Chicago, IL 60602-4515
Tel:  (312) 236-0733

**ATTORNEYS FOR PLAINTIFF
ABLAISE LTD. AND GENERAL INVENTIONS
INSTITUTE A, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the foregoing Ablaise LTD and General Inventions Institute A, Inc.'s Responsive Markman Brief in Support of its Proposed Claim Construction, Affidavit of Andrew M. Ritchie, Affidavit of Christian B. Hicks and Declaration of Trevor J. Foster were served this 4th day of April, 2007 via electronic means and first class mail, postage prepaid, to the following:

Creighton R. Magid
Dorsey & Witney LLP
1001 Pennsylvania Avenue, N.W.
Suite 400 North
Washington, D.C. 20004
Ph: (202) 442-3000
Fx: (202) 442-3199


Devan V. Padmanabhan
Sri K. Sankaran
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Ph: (612) 340-2600
Fx: (612) 340-8856

Attorneys for Plaintiff


_____
Jeffrey J. Downey

# Exhibit E

1    [COUNSEL LISTED ON SIGNATURE PAGE]

2

3                    UNITED STATES DISTRICT COURT

4                  NORTHERN DISTRICT OF CALIFORNIA

5                          OAKLAND DIVISION

6

7    FINANCIAL FUSION, INC,                CASE NO.  C06-02451 SBA

8              Plaintiff,                  **RULE 26(a) DISCLOSURES[1]**

9    v.

10   ABLAISE LTD., and GENERAL
     INVENTIONS INSTITUTE A, INC.

11            Defendants.

12   YODLEE, INC.,                         **RELATED CASE**

13            Plaintiff,

14   v.                                    CASE NO.  C06-07222 SBA

15   ABLAISE LTD., and GENERAL
     INVENTIONS INSTITUTE A, INC.

16

17            Defendants.

18   ABLAISE LTD., and GENERAL             **RELATED CASE**
     INVENTIONS INSTITUTE A, INC.,

19
              Plaintiff,
20                                         CASE NO.  C06-001995 SBA

     v.
21
     BANK OF AMERICA CORPORATION,
22
              Defendant.
23

24        **Ablaise Ltd. And General Inventions Institute A, Inc.'s  Initial**
25       **Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1)**

26       Ablaise Ltd. And General Inventions Institute A, Inc.'s ("Ablaise") hereby makes

27

28   ───────────────
     [1] As these cases are related, but not consolidated, we are serving one RULE 26(a) Disclosure for all three cases.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

its Initial Disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1). Ablaise

makes these initial disclosures based on information reasonably available to Ablaise at

this time and subject to a duty under Federal Rule of Civil Procedure 26(e) to supplement

or correct the disclosures to include information acquired hereafter. Ablaise makes these

disclosures without waiving any claim for privilege or work product protection, any

objections to the discoverability of information, or any other exemptions from disclosure

or discovery.

A.    Rule 26(a)(1)(A):    "[T]he name and, if known, the address and

telephone number of each individual likely to have discoverable information that the

disclosing party may use to support its claims or defenses, unless solely for

impeachment, identifying the subjects for the information."

| NAME | ADDRESS AND TELEPHONE NUMBER | SUBJECT OF INFORMATION |
|---|---|---|
| Andrew M. Ritchie | 15 Benwell Court, Sudbury-On-Thames (GB), TW16 6RU<br><br>+44 (0) 7788 577759 | The technology of the patents-in-suit and licensing efforts. |
| Jonathan M. Bradshaw | 30 Underwood, Bracknell (GB), RG12 8XL<br><br>+44 (0) 7970 268442 | The technology of the patents-in-suit and licensing efforts. |

Ablaise reserves the right to name at a later date additional individuals who may be

identified through discovery. Ablaise also reserves the right to rely upon expert testimony

regarding the infringement of U.S. Patent Nos. 6,295,530 ("the '530 patent") and

6,961,737 ("the '737 patent"), the validity of the '530 and '737 patents, and damages.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

**B.    Rule 26(a)(1)(B):    "[A] copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody, or control of the party and that the disclosing may use to support its claims or defenses, unless solely for impeachment."**

At this time, Ablaise believes that the following categories of documents, data compilations, and tangible things in the possession, custody or control of Ablaise or its retained counsel that Ablaise may use to support its claims or defenses:

- United States Patent No. 6,295,530, titled "Internet Service of Differently Formatted Viewable Data Signals Including Commands For Browser Execution," issued on September 25, 2001;

- United States Patent No. 6,961,737, titled "Serving Signals," issued on November 1, 2005;

- The United States Patent and Trademark Office prosecution history files for the above-listed patents-in-suit;

- References cited in the United States Patent and Trademark Office prosecution history files for the above-listed patents-in-suit;

- Historical documents potentially relating to the inventorship, conception, and reduction to practice of the subject matter of the '530 and '737 patents;

- Documents related to Ablaise's attempts to license Its technology.

- The websites and all related documents of Bank of America Corporation, Yodlee, Inc. and Financial Fusion, Inc., or any customers of Yodlee, Inc. and Financial Fusion, Inc.

- Other documents in the possession or control of Bank of America Corporation, Yodlee, Inc. and Financial Fusion, Inc that Ablaise has not yet been able to obtain through discovery.

These documents exist at the locations listed above for the Messrs. Ritchie and Bradshaw.

Because Plaintiffs (Financial Fusion, Inc. and Yodlee, Inc. and Defendants (Bank of America) have not identified all of the bases for their defenses and counterclaims, and because Ablaise's review of the allegations in this matter is ongoing, Ablaise reserves its right to identify additional documents as discovery proceeds.

**C.    Rule 26(a)(1)(C):    "[A] computatuion of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged  or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered."**

Ablaise has experienced economic and irreparable harm as a result of infringement of one or more of the patents-in-suit.  Pursuant to 35 U.S.C. § 283, Ablaise will seek relief from continued infringement of any and all of the patents-in-suit.  In addition, pursuant to 35 U.S.C. § 284, Ablaise is seeking damages adequate to compensate it for  infringement

of the asserted claims of the patents-in-suit, but in no event less than a reasonable royalty for the use made of the inventions, together with pre- and post-judgment interest and costs as fixed by the Court. Ablaise may also show that by continuing to make, sell, use, and offer for sale their inventions, Opposing Parties' are engaged in willful and deliberate infringement that justifies increased damages and may qualify this as an exceptional case supporting the award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

Since much of the information necessary to make damages calculations is in Opposing Parties' possession, at this time it is difficult for Ablaise to make any computation of damages absent further discovery and disclosure. Ablaise reserves the right to modify its damages theories and calculations, or to seek damages under different theories as appropriate in view of information to be discovered in this case and in view of further anticipated expert opinions on the subject of damages.

**D.      Rule 26(a)(1)(D):      "[F]or inspection and copying as under Rule 34 and insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment."**

Not applicable.

- 5 -

DATED:  September 12, 2007

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

By:

Ronald J. Schutz, Esq.
Jake H. Holdreith, Esq.
Cyrus A. Morton, Esq.
Trevor J. Foster, Esq.
Seth Northrop, Esq.

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN  55402-2015
612-349-8500

**DAVIS WRIGHT TREMAINE LLP**

Martin L. Fineman, Esq. (CA State Bar No. 104413)

505 Montgomery Street
Suite 800
San Francisco, California  94111
415-276-6500

**ATTORNEYS FOR ABLAISE LTD. AND GENERAL INVENTORS INSTITUTE A, INC.**

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

- 6 -

## CERTIFICATE OF SERVICE

I, Michele M. Tacheny, hereby certify that I caused a copy of **Ablaise Ltd.'s and General Inventions Institute A, Inc.'s Rule 26(a) Disclosures** to be served upon:

### *Via Electronic Mail & U.S. Mail*

Linda J. Thayer
Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P.
3300 Hillview Avenue
Palo Alto, CA 94304-1203
linda.thayer@finnegan.com

### *Via Electronic Mail & U.S. Mail*

David M. Barkan
Fish & Richardson P.C.
500 Arguello St.
Suite 500
Redwood City, CA 94063
barkan@fr.com

on this 12th day of September, 2007

Michele M. Tacheny

MP3 20241323.1

# Exhibit F



Home    Flights    Hotels    Cars/Rail    Vacation Packages    Cruises    Last Minute Packages    Activities

**Your Flight to Memphis, TN (MEM)**
Departing: Wed, Nov 28 · Returning: Wed, Dec 5 | 1 Adult
Change Your Search

Save to FareWatcher Plus℠

| Your Search<br>Depart Wed, Nov 28<br>from $663 | Flights + 7 Nights Hotel<br>Save with TotalTrip℠<br>from $1,036 | |
|---|---|---|

? Help with this page

Prices shown are for e-tickets. Paper tickets require additional fees.

| | British Airways | Lufthansa | United | Delta Air Lines | Northwest Airlines | US Airways | Continental Airlines |
|---|---|---|---|---|---|---|---|
| **1-Stops Only**<br>55 flights | $663<br>11 flights | 8 flights | $683<br>8 flights | $689<br>4 flights | $704<br>7 flights | $726<br>2 flights | $729<br>2 flights |
| **All 64 Flights**<br>displayed below | $663<br>11 flights | $682<br>7 flights | $683<br>8 flights | $689<br>4 flights | $704<br>7 flights | $726<br>2 flights | $729<br>3 flights |

| Featured Package | Flights + 7 Nights Hotel from $1,036 |
|---|---|

**Select Departing Flight for Wed, Nov 28**

64 flight options: 1 - 25 | 26 - 50 | 51 - 64

| Airline | Departure Time | Arrival Time | Total Travel Time | Roundtrip Price<br>Includes taxes and fees | |
|---|---|---|---|---|---|
| British Airways<br>Flight 2237<br>AirTran Airways<br>Flight 536 | 11:50am<br>London, Great Britain (LGW) | 7:28pm<br>Memphis, TN (MEM) | 13hrs 38min - 1 Stop<br>Change planes in Atlanta, GA (ATL) | $663<br>per person | |
| Lufthansa<br>Flight 4903 / Flight 9150 operated by United / Flight 5700 operated by UNITED EXPRESS/SKYWEST<br>View Seats | 7:15am<br>London, Great Britain (LCY) | 9:56pm<br>Memphis, TN (MEM) | 20hrs 41min - 2 Stops<br>Change planes in Frankfurt, Germany (FRA)<br>Change planes in Chicago, IL (ORD) | $682<br>per person | $1,036<br>per person<br>or This Flight + 7 Nights Hotel<br>Select |
| Lufthansa<br>Flight 4901 / Flight 9150 operated by United<br>United<br>Flight 5703 operated by UNITED EXPRESS/SKYWEST<br>View Seats | 9:10am<br>London, Great Britain (LCY) | 9:56pm<br>Memphis, TN (MEM) | 18hrs 46min - 2 Stops<br>Change planes in Frankfurt, Germany (FRA)<br>Change planes in Chicago, IL (ORD) | $682<br>per person | |
| Lufthansa<br>Flight 4901 / Flight 9150 operated by United / Flight 5700 operated by UNITED EXPRESS/SKYWEST<br>View Seats | 9:10am<br>London, Great Britain (LCY) | 9:56pm<br>Memphis, TN (MEM) | 18hrs 46min - 2 Stops<br>Change planes in Frankfurt, Germany (FRA)<br>Change planes in Chicago, IL (ORD) | $682<br>per person<br>Select | |
| United<br>Flight 929 / Flight 6823 operated by UNITED EXPRESS/SKYWEST<br>View Seats | 10:25am<br>London, Great Britain (LHR) | 4:26pm<br>Memphis, TN (MEM) | 12hrs 1min - 1 Stop<br>Change planes in Chicago, IL (ORD) | $683<br>per person | |
| United<br>Flight 929 / Flight 8342 operated by UNITED EXPRESS/SKYWEST<br>View Seats | 10:25am<br>London, Great Britain (LHR) | 5:53pm<br>Memphis, TN (MEM) | 13hrs 28min - 1 Stop<br>Change planes in Chicago, IL (ORD) | $683<br>per person<br>Select | |
| United<br>Flight 959 / Flight 6763 operated by UNITED EXPRESS/SKYWEST<br>View Seats | 3:25pm<br>London, Great Britain (LHR) | 9:56pm<br>Memphis, TN (MEM) | 12hrs 31min - 1 Stop<br>Change planes in Chicago, IL (ORD) | $683<br>per person<br>Select | |
| Delta Air Lines<br>Flight 11 / 4273 | 10:00am<br>London, Great Britain (LGW) | 4:38pm<br>Memphis, TN (MEM) | 12hrs 38min - 1 Stop<br>Change planes in Atlanta, GA (ATL) | $689<br>per person<br>Select | Free Curbside Check-in more |
| Delta Air Lines<br>Flight 11 | 10:00am<br>London, Great Britain (LGW) | 5:58pm<br>Memphis, TN (MEM) | 13hrs 58min - 1 Stop<br>Change planes in Atlanta, GA (ATL) | $689 | |

| | | | | | |
|---|---|---|---|---|---|
| Northwest Airlines Flight 205 | | | | per person | |
| View Seats | | | | Select | |
| Delta Air Lines Flight 11 / 1996 | 10:00am London, Great Britain (LGW) | 5:49pm Memphis, TN (MEM) | 13hrs 49min - 1 Stop Change planes in Atlanta, GA (ATL) | $689 per person | Free Curbside Check-in more |
| View Seats | | | | Select | |
| Northwest Airlines Flight 43 / 446 | 12:05pm London, Great Britain (LGW) | 8:53pm Memphis, TN (MEM) | 14hrs 48min - 1 Stop Change planes in Minneapolis, MN (MSP) | $704 per person | |
| View Seats | | | | Select | |
| Northwest Airlines Flight 43 / 458 | 12:05pm London, Great Britain (LGW) | 6:50pm Memphis, TN (MEM) | 12hrs 45min - 1 Stop Change planes in Minneapolis, MN (MSP) | $704 per person | |
| View Seats | | | | Select | |
| Northwest Airlines Flight 31 / 279 | 1:45pm London, Great Britain (LGW) | 10:02pm Memphis, TN (MEM) | 14hrs 17min - 1 Stop Change planes in Detroit, MI (DTW) | $704 per person | |
| View Seats | | | | Select | |
| Northwest Airlines Flight 31 / 2888 | 1:45pm London, Great Britain (LGW) | 7:59pm Memphis, TN (MEM) | 12hrs 14min - 1 Stop Change planes in Detroit, MI (DTW) | $704 per person | |
| View Seats | | | | Select | |
| Delta Air Lines Flight 37 / 5039 | 11:10am London, Great Britain (LGW) | 5:24pm Memphis, TN (MEM) | 12hrs 14min - 1 Stop Change planes in Cincinnati, OH (CVG) | $710 per person | Free Curbside Check-in more |
| View Seats | | | | Select | |
| Lufthansa Flight 4815 United Flight 987 / Flight 8703 operated by UNITED EXPRESS/SKYWEST | 8:10am London, Great Britain (LCY) | 9:56pm Memphis, TN (MEM) | 19hrs 46min - 2 Stops Change planes in Munich, Germany (MUC) Change planes in Chicago, IL (ORD) | $712 per person | |
| View Seats | | | | Select | |
| Lufthansa Flight 4803 United Flight 945 / Flight 8703 operated by UNITED EXPRESS/SKYWEST | 7:15am London, Great Britain (LCY) | 9:56pm Memphis, TN (MEM) | 20hrs 41min - 2 Stops Change planes in Frankfurt, Germany (FRA) Change planes in Chicago, IL (ORD) | $712 per person | |
| View Seats | | | | Select | |
| Lufthansa Flight 4801 United Flight 941 / Flight 8703 operated by UNITED EXPRESS/SKYWEST | 9:10am London, Great Britain (LCY) | 9:56pm Memphis, TN (MEM) | 18hrs 46min - 2 Stops Change planes in Frankfurt, Germany (FRA) Change planes in Chicago, IL (ORD) | $712 per person | |
| View Seats | | | | Select | |
| US Airways Flight 733 / Flight 2231 operated by US Airways Express - PSA Airlines | 11:40am London, Great Britain (LGW) | 6:18pm Memphis, TN (MEM) | 12hrs 38min - 1 Stop Change planes in Charlotte, NC (CLT) | $726 per person | |
| View Seats | | | | Select | |
| Continental Airlines Flight 19 / Flight 2784 operated by EXPRESSJET AIRLINES INC DBA CO EXPRESS | 10:30am London, Great Britain (LGW) | 6:03pm Memphis, TN (MEM) | 13hrs 33min - 1 Stop Change planes in Newark, NJ (EWR) | $729 per person | |
| View Seats | | | | Select | |
| Continental Airlines Flight 19 / Flight 7016 operated by Northwest Airlines | 10:30am London, Great Britain (LGW) | 6:32pm Memphis, TN (MEM) | 14hrs 2min - 1 Stop Change planes in Newark, NJ (EWR) | $729 per person | |
| View Seats | | | | Select | |
| British Airways Flight 295 Northwest Airlines Flight 1422 | 11:35am London, Great Britain (LHR) | 6:47pm Memphis, TN (MEM) | 13hrs 12min - 1 Stop Change planes in Chicago, IL (ORD) | $738 per person | |
| View Seats | | | | Select | |
| British Airways Flight 299 American Airlines Flight 3955 operated by American Eagle | 3:30pm London, Great Britain (LHR) | 11:10pm Memphis, TN (MEM) | 13hrs 40min - 1 Stop Change planes in Chicago, IL (ORD) | $738 per person | |
| View Seats | | | | Select | |
| Virgin Atlantic Flight 27 Northwest Airlines | 11:15am London, Great Britain (LGW) | 6:44pm Memphis, TN (MEM) | 13hrs 29min - 1 Stop Change planes in Orlando, FL (MCO) | $756 per person | |

Travelocity: Outbound Search Results

| | | | | | |
|---|---|---|---|---|---|
| Flight 986 | View Seats | | | | Select |
| KLM Royal Dutch Airlines<br>Flight 1662 | 8:40am<br>London, Great Britain (LHR) | 5:00pm<br>Memphis, TN (MEM) | 14hrs 20min - 1 Stop<br>Change planes in Amsterdam, Netherlands (AMS) | $756<br>per person | |
| Northwest Airlines<br>Flight 87 | | | | | Select |

Change Your Search | Save to FareWatcher Plus℠        64 flight options:  1 - 25 | 26 - 50 | 51 - 64

More Flights

# Exhibit
# G

Travelocity: Outbound Search Results





Home   Flights   Hotels   Cars/Rail   Vacation Packages   Cruises   Last Minute Packages   Activities

**Your Flight to Washington, DC (WAS)**

Save to FareWatcher Plus℠

Departing: Wed, Nov 28 - Returning: Wed, Dec 5 | 1 Adult
Change Your Search

| Your Search | Flights + 7 Nights Hotel | | |
|---|---|---|---|
| Depart Wed, Nov 28 from $479 | Save with TotalTrip℠ from $956 | | |

? Help with this page

ℹ **Information about your flight results.**
- Your original criteria is only available for searches within the US and Canada.
- Results for your main search are below.

Prices shown are for e-tickets. Paper tickets require additional fees.

| | United | British Airways | Lufthansa | Northwest Airlines | Continental Airlines | Delta Air Lines | US Airways |
|---|---|---|---|---|---|---|---|
| Nonstops Only 8 flights | $479 3 nonstops | $499 3 nonstops | 0 nonstops | 0 nonstops | $1,249 1 nonstop | 0 nonstops | 0 nonstop |
| All 71 Flights displayed below | $479 3 flights | $499 13 flights | $508 7 flights | $524 4 flights | $527 5 flights | $527 1 flight | $548 4 flights |

| Featured Package | Flights + 7 Nights Hotel from $956 |
|---|---|

**Select Departing Flight for Wed, Nov 28**

71 flight options:  1 - 25 | 26 - 50 | 51 - 71

| Airline | Departure Time | Arrival Time | Total Travel Time | Roundtrip Price |
|---|---|---|---|---|
| United Flight 923 | 7:55am London, Great Britain (LHR) | 11:28am Washington, DC (IAD) | 8hrs 33min - Nonstop | $479 per person  or  $956 per person This Flight + 7 Nights Hotel |
| View Seats | | | | Select |
| United Flight 919 | 12:00pm London, Great Britain (LHR) | 3:24pm Washington, DC (IAD) | 8hrs 24min - Nonstop | $479 per person |
| View Seats | | | | Select |
| United Flight 925 | 4:20pm London, Great Britain (LHR) | 7:41pm Washington, DC (IAD) | 8hrs 21min - Nonstop | $479 per person |
| View Seats | | | | Select |
| British Airways Flight 217 | 10:55am London, Great Britain (LHR) | 2:10pm Washington, DC (IAD) | 8hrs 15min - Nonstop | $499 per person |
| View Seats | | | | Select |
| Lufthansa Flight 4843 / United Flight 917 | 7:15am London, Great Britain (LCY) | 3:09pm Washington, DC (IAD) | 12hrs 54min - 1 Stop Change planes in Frankfurt, Germany (FRA) | $508 per person |
| View Seats | | | | Select |
| Lufthansa Flight 4803 / United Flight 883 | 7:15am London, Great Britain (LCY) | 2:29pm Washington, DC (IAD) | 12hrs 14min - 1 Stop Change planes in Frankfurt, Germany (FRA) | $508 per person |
| View Seats | | | | Select |
| Lufthansa Flight 4801 / United Flight 8827 operated by Lufthansa | 9:10am London, Great Britain (LCY) | 4:00pm Washington, DC (IAD) | 11hrs 50min - 1 Stop Change planes in Frankfurt, Germany (FRA) | $508 per person |
| | | | | Select |
| Northwest Airlines Flight 31 / 226 | 1:45pm London, Great Britain (LGW) | 8:58pm Washington, DC (DCA) | 12hrs 13min - 1 Stop Change planes in Detroit, MI (DTW) | $524 |

Travelocity: Outbound Search Results

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | per person | |
| | | | | | Select | |
| Delta Air Lines<br>Flight 2 / 5057 | 9:15am<br>London, Great Britain (LGW) | 4:08pm<br>Baltimore, MD (BWI) | 11hrs 53min - 1 Stop<br>Change planes in New York, NY (JFK) | **$527** | per person<br>Select | Free Curbside<br>Check-in more |
| Continental Airlines<br>Flight 19 / 1111 | 10:30am<br>London, Great Britain (LGW) | 4:18pm<br>Washington, DC (DCA) | 10hrs 48min - 1 Stop<br>Change planes in Newark, NJ (EWR) | **$527** | per person<br>Select | |
| Continental Airlines<br>Flight 19 / Flight 2602 operated<br>by EXPRESSJET AIRLINES<br>INC DBA CO EXPRESS | 10:30am<br>London, Great Britain (LGW) | 5:34pm<br>Baltimore, MD (BWI) | 12hrs 4min - 1 Stop<br>Change planes in Newark, NJ (EWR) | **$527** | per person<br>Select | |
| Continental Airlines<br>Flight 115 / Flight 1279 operated<br>by EXPRESSJET AIRLINES<br>INC DBA CO EXPRESS | 11:30am<br>London, Great Britain (LGW) | 6:23pm<br>Washington, DC (IAD) | 11hrs 53min - 1 Stop<br>Change planes in Newark, NJ (EWR) | **$527** | per person<br>Select | |
| British Airways<br>Flight 293 | 5:00pm<br>London, Great Britain (LHR) | 8:05pm<br>Washington, DC (IAD) | 8hrs 5min - Nonstop | **$541** | per person<br>1 seat left<br>at this price<br>Select | |
| US Airways<br>Flight 731 / 1762 | 11:55am<br>London, Great Britain (LGW) | 6:58pm<br>Washington, DC (DCA) | 12hrs 3min - 1 Stop<br>Change planes in Philadelphia, PA (PHL) | **$548** | per person<br>Select | |
| US Airways<br>Flight 731 / 1589 | 11:55am<br>London, Great Britain (LGW) | 7:34pm<br>Baltimore, MD (BWI) | 12hrs 39min - 1 Stop<br>Change planes in Philadelphia, PA (PHL) | **$548** | per person<br>Select | |
| American Airlines<br>Flight 125 / Flight 4755 operated<br>by American Eagle | 10:15am<br>London, Great Britain (STN) | 5:35pm<br>Washington, DC (DCA) | 12hrs 20min - 1 Stop<br>Change planes in New York, NY (JFK) | **$549** | per person<br>Select | |
| Lufthansa<br>Flight 4723 / 418 | 8:55am<br>London, Great Britain (LHR) | 4:00pm<br>Washington, DC (IAD) | 12hrs 5min - 1 Stop<br>Change planes in Frankfurt, Germany (FRA) | **$554** | per person<br>Select | |
| US Airways<br>Flight 733 / 838 | 11:40am<br>London, Great Britain (LGW) | 6:59pm<br>Washington, DC (IAD) | 12hrs 19min - 1 Stop<br>Change planes in Charlotte, NC (CLT) | **$555** | per person<br>Select | |
| Lufthansa<br>Flight 4882 / Flight 9050 operated<br>by United | 7:15am<br>London, Great Britain (LCY) | 3:09pm<br>Washington, DC (IAD) | 12hrs 54min - 1 Stop<br>Change planes in Frankfurt, Germany (FRA) | **$556** | per person<br>Select | |
| Lufthansa<br>Flight 4603 / Flight 9290 operated<br>by United | 7:15am<br>London, Great Britain (LCY) | 2:29pm<br>Washington, DC (IAD) | 12hrs 14min - 1 Stop<br>Change planes in Frankfurt, Germany (FRA) | **$556** | per person<br>Select | |
| Lufthansa<br>Flight 4881 / 418 | 9:10am<br>London, Great Britain (LCY) | 4:00pm<br>Washington, DC (IAD) | 11hrs 50min - 1 Stop<br>Change planes in Frankfurt, Germany (FRA) | **$556** | per person<br>Select | |
| American Airlines<br>Flight 105 / Flight 4755 operated<br>by American Eagle | 12:00pm<br>London, Great Britain (LHR) | 5:35pm<br>Washington, DC (DCA) | 10hrs 35min - 1 Stop<br>Change planes in New York, NY (JFK) | **$561** | per person<br>2 seats left<br>at this price<br>Select | |
| American Airlines<br>Flight 173 / Flight 4878 operated<br>by American Eagle | 12:40pm<br>London, Great Britain (LGW) | 7:15pm<br>Washington, DC (DCA) | 11hrs 35min - 1 Stop<br>Change planes in Raleigh/Durham, NC (RDU) | **$569** | per person<br>Select | |

Northwest Airlines

Travelocity: Outbound Search Results

| | | | | | |
|---|---|---|---|---|---|
| Flight 8842 operated by KLM CITYHOPPER/KLM / Flight 8851 operated by KLM Royal Dutch Airlines | 7:30am London, Great Britain (LCY) | 3:55pm Washington, DC (IAD) | 13hrs 25min - 1 Stop Change planes in Amsterdam, Netherlands (AMS) | $578 per person Select | Turboprop Service more |
| View Seats | | | | | |
| KLM Royal Dutch Airlines Flight 1896 operated by KLM CITYHOPPER | 8:55am London, Great Britain (LCY) | 3:55pm Washington, DC (IAD) | 12hrs - 1 Stop Change planes in Amsterdam, Netherlands (AMS) | $578 per person Select | Turboprop Service more |
| Northwest Airlines Flight 8831 operated by KLM Royal Dutch Airlines | | | | | |

Change Your Search  |  Save to FareWatcher Plus℠          71 flight options:   1 - 25 | 26 - 50 | 51 - 71

More Flights

# Exhibit H

# ROBINS, KAPLAN, MILLER & CIRESI LLP

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
Tel: 612-349-8500 Fax: 612-339-4181
www.rkmc.com

ATTORNEYS AT LAW

PATRICK M. ARENZ
612-349-8591
pmarenz@rkmc.com

October 10, 2007

Ms. Linda Thayer                                        *Via E-Mail and U.S. Mail*
Finnegan, Henderson, Farabow,
    Garrett & Dunner, L.L.P.
3300 Hillview Ave.
Palo Alto, CA 94304

Re:    *Financial Fusion v. Ablaise Ltd.*
       Court File No. C06-02451 SBA

Dear Ms. Thayer:

I am writing in regards to Ablaise's disclosure of documents pursuant to Patent Local Rule 3.2. Ablaise has retained documents that may fall under the categories of documents listed in Rule 3.2. These documents are stored in various electronic media forms. The media forms include: personal computers, back-up tapes, hard drives, CDs, and floppy disks. Before this information can be reviewed, however, it will need to be restored due to its age. Our estimate is that the electronically stored information is approximately nine terabytes of data. Based on our investigation of the cost, burden and time required to restore this data and review it, Ablaise does not intend to restore and review the data at this time.

If you wish to review the data, including bearing the costs of restoring it, please let us know. Ablaise makes no representation that any document in this storage predates Ablaise's U.K. filing date. The only way to determine whether any documents predate the U.K. filing date is to restore the information and review it. In accordance with Patent Local Rule 3.2, therefore, Ablaise will make this stored information available for inspection at a mutually agreed time and location in the U.K. The inspection will be contingent on Yodlee and Bank of America employing a procedure that protects the integrity of the stored information.

Please let me know what dates work best for you.

Very Truly Yours,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

Patrick M. Arenz

PMA/lab

MP3 20244899.1

ATLANTA · BOSTON · LOS ANGELES · MINNEAPOLIS · NAPLES · SAINT PAUL · WASHINGTON, D.C.

# Exhibit I

# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
TEL: 612-349-8500 FAX: 612-339-4181
www.rkmc.com

ATTORNEYS AT LAW

PATRICK M. ARENZ
612-349-8591
pmarenz@rkmc.com

October 10, 2007

Mr. David Barkan
Fish & Richardson P.C.
500 Arguello St.
Redwood City, CA 95063

*Via E-Mail and U.S. Mail*

Re:    *Yodlee v. Ablaise Ltd.*
       Court File No. C06-7222 SBA
       *Ablaise Ltd. v. Bank of America*
       Court File No. 06-530-SLR

Dear Mr. Barkan:

I am writing in regards to Ablaise's disclosure of documents pursuant to Patent Local Rule 3.2. Ablaise has retained documents that may fall under the categories of documents listed in Rule 3.2. These documents are stored in various electronic media forms. The media forms include: personal computers, back-up tapes, hard drives, CDs, and floppy disks. Before this information can be reviewed, however, it will need to be restored due to its age. Our estimate is that the electronically stored information is approximately nine terabytes of data. Based on our investigation of the cost, burden and time required to restore this data and review it, Ablaise does not intend to restore and review the data at this time.

If you wish to review the data, including bearing the costs of restoring it, please let us know. Ablaise makes no representation that any document in this storage predates Ablaise's U.K. filing date. The only way to determine whether any documents predate the U.K. filing date is to restore the information and review it. In accordance with Patent Local Rule 3.2, therefore, Ablaise will make this stored information available for inspection at a mutually agreed time and location in the U.K. The inspection will be contingent on Yodlee and Bank of America employing a procedure that protects the integrity of the stored information.

Please let me know what dates work best for you.

Very Truly Yours,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

Patrick M. Arenz

PMA/lab

MP3 20244901.1

# Exhibit J

# FISH & RICHARDSON P.C.

500 Arguello Street
Suite 500
Redwood City, California
94063-1526

Telephone
650 839-5070

Facsimile
650 839-5071

Web Site
www.fr.com

Jonathan J. Lamberson
650 839-5076

Email
Lamberson@fr.com

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

**VIA FACSIMILE AND U.S. MAIL**
**(612) 339-4181**

October 22, 2007

Patrick M. Arenz
Robins, Kaplan, Miller & Ciresi L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015

ATLANTA

AUSTIN

BOSTON

DALLAS

DELAWARE

MUNICH

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC

Re:  Yodlee v. Ablaise and Ablaise v. Bank of America
      United States District Court, Northern District of California

Dear Mr. Arenz:

I write in response to your October 10, 2007, letter to David Barkan regarding Ablaise's disclosure of documents pursuant to Patent Local Rule 3.2. Your request that Yodlee and Bank of America travel to London to inspect nine terabytes of data in various formats that may or may not relate to Ablaise's conception is unreasonable and is contrary to the Patent Local Rules.

Your October 10th letter states that this repository of electronic data, "may fall under the categories of documents listed in Rule 3-2." Your letter goes on to state that Ablaise has not yet reviewed the documents and has no intention of doing so. Whether documents are physically produced or made available for inspection, Patent L.R. 3-2 requires that "[t]he producing party shall separately identify by production number which documents correspond to each category." To make such an identification, the producing party must have conducted a good faith investigation to identify which documents fall into the category of "All documents evidencing the conception, reduction to practice, design, and development of each claimed invention, which were created on or before the date of application for the patent in suit or the priority date identified pursuant to Patent L.R. 3-1(e), whichever is earlier."

The Patent Local Rules thus plainly contemplate that the patentee has the obligation to search for and identify documents falling under Patent L.R. 3-2. Since your letter firmly states that Ablaise will not even undertake such a search, your proposal does not satisfy the Local Rule requirements. Please let us know whether Ablaise will re-consider its position. In the alternative, we are willing consider a stipulation under which Ablaise will be relieved from its Patent L.R. 3-2(b) obligations if it agrees not to assert an invention date earlier than the filing date of its patent applications. Please

FISH & RICHARDSON P.C.

Patrick M. Arenz
October 22, 2007
Page 2

contact us to discuss such a stipulation.  In any event, please provide us your position in reply to this letter by no later than October 26.

Very truly yours,

Jonathan J. Lamberson

50443833.doc

# Exhibit K

# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
Tel: 612-349-8500 Fax: 612-339-4181
www.rkmc.com

ATTORNEYS AT LAW

PATRICK M. ARENZ
612-349-8591

October 26, 2007

**VIA EMAIL AND U.S. MAIL**

Mr. Jonathan J. Lamberson
Fish & Richardson P.C.
500 Arguello Street
Suite 500
Redwood City, California 94063

Re:    Ablaise v. Bank of America and Yodlee v. Ablaise
Our File No.: 124258.0002/0003

Dear Mr. Lamberson:

I am writing in response to your October 22, 2007 letter. In order to avoid further dispute, Ablaise will not rely on any document falling under Patent Local Rule 3-2 to claim priority before the U.K. filing date for purposes of swearing behind any prior art.

Sincerely,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

Patrick M. Arenz

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ABLAISE, LTD., | ) | |
| Plaintiff, | ) | Civil Action No.:  1:07-CV-01836 |
| | ) | |
| v. | ) | Judge James Robertson |
| | ) | |
| NAVTEQ CORP., FEDEX CORP., FEDEX | ) | |
| CORPORATE SERVICES, INC., GENERAL | ) | |
| MOTORS CORP., ALASKA AIR GROUP, | ) | |
| INC., AND CIRCUIT CITY STORES, INC. | ) | |
| | ) | |
| Defendants. | | |

**[PROPOSED] ORDER**

It is ORDERED that, for good cause showing, FedEx Corporate Services, Inc. be

dismissed as a party from this action.

JAMES ROBERTSON
United States District Judge